Alan R. KAHN, as custodian for Amanda Kahn and Kimberly Kahn, Plaintiff Below, Appellant,

v.

LYNCH COMMUNICATION SYSTEMS, INC., Compagnie Generale d'Electricite, Alcatel, S.A., Alcatel USA Corp., Frank M. Drendel, Raymond Hono, Francois H. de Laage de Meux, John Gailey and Gilles DuPay–d'Ageac, Defendants Below, Appellees.

No. 272, 1993.

Supreme Court of Delaware.

Submitted: Feb. 1, 1994.
Decided: April 5, 1994.

Victor F. Battaglia and Robert D. Goldberg of Biggs and Battaglia, Wilmington, Sidney B. Silverman (argued), and Joan Harnes of Silverman, Harnes, Obstfeld & Harnes, New York City, for appellant.

Allen M. Terrell, Jr. (argued), and John T. Dorsey of Richards, Layton & Finger, Wilmington, Heyden J. Silver, III of Moore &, Van Allen, Raleigh, NC, for appellees.

1. In his capacity as custodian for Amanda and Kimberly Kahn, Kahn held 525 shares of Lynch

Before MOORE, WALSH, and HOLLAND, JJ.

HOLLAND, Justice:

This is an appeal by the plaintiff-appellant, Alan R. Kahn ("Kahn"), from a final judgment of the Court of Chancery which was entered after a trial. The action, instituted by Kahn in 1986, originally sought to enjoin the acquisition of the defendant-appellee, Lynch Communication Systems, Inc. ("Lynch"), by the defendant-appellee, Alcatel U.S.A. Corporation ("Alcatel"), pursuant to a tender offer and cash-out merger.[1] Kahn amended his complaint to seek monetary damages after the Court of Chancery denied his request for a preliminary injunction. The Court of Chancery subsequently certified Kahn's action as a class action on behalf of all Lynch shareholders, other than the named defendants, who tendered their stock in the merger, or whose stock was acquired through the merger.

A three-day trial was held April 13–15, 1993. Kahn alleged that Alcatel was a controlling shareholder of Lynch and breached its fiduciary duties to Lynch and its shareholders. According to Kahn, Alcatel dictated the terms of the merger; made false, misleading, and inadequate disclosures; and paid an unfair price.

The Court of Chancery concluded that Alcatel was, in fact, a controlling shareholder that owed fiduciary duties to Lynch and its shareholders. It also concluded that Alcatel had not breached those fiduciary duties. Accordingly, the Court of Chancery entered judgment in favor of the defendants.

Kahn has raised three contentions in this appeal. Kahn's first contention is that the Court of Chancery erred by finding that "the tender offer and merger were negotiated by an independent committee," and then placing the burden of persuasion on the plaintiff, Kahn. Kahn asserts the uncontradicted testimony in the record demonstrated that the committee could not and did not bargain at arm's length with Alcatel. Kahn's second contention is that Alcatel's Offer to Purchase common stock.

was false and misleading because it failed to disclose threats made by Alcatel to the effect that if Lynch did not accept its proposed price, Alcatel would institute a hostile tender offer at a lower price. Third, Kahn contends that the merger price was unfair. Alcatel contends that the Court of Chancery was correct in its findings, with the exception of concluding that Alcatel was a controlling shareholder.

This Court has concluded that the record supports the Court of Chancery's finding that Alcatel was a controlling shareholder. However, the record does not support the conclusion that the burden of persuasion shifted to Kahn. Therefore, the burden of proving the *entire* fairness of the merger transaction remained on Alcatel, the controlling shareholder. Accordingly, the judgment of the Court of Chancery is reversed. The matter is remanded for further proceedings in accordance with this opinion.

### Facts

Lynch, a Delaware corporation, designed and manufactured electronic telecommunications equipment, primarily for sale to telephone operating companies. Alcatel, a holding company, is a subsidiary of Alcatel (S.A.), a French company involved in public telecommunications, business communications, electronics, and optronics. Alcatel (S.A.), in turn, is a subsidiary of Compagnie Generale d'Electricite ("CGE"), a French corporation with operations in energy, transportation, telecommunications and business systems.[2]

In 1981, Alcatel acquired 30.6 percent of Lynch's common stock pursuant to a stock purchase agreement. As part of that agreement, Lynch amended its certificate of incorporation to require an 80 percent affirmative vote of its shareholders for approval of any business combination. In addition, Alcatel obtained proportional representation on the Lynch board of directors and the right to purchase 40 percent of any equity securities offered by Lynch to third parties. The agreement also precluded Alcatel from hold-

ing more than 45 percent of Lynch's stock prior to October 1, 1986. By the time of the merger which is contested in this action, Alcatel owned 43.3 percent of Lynch's outstanding stock; designated five of the eleven members of Lynch's board of directors; two of three members of the executive committee; and two of four members of the compensation committee.

In the spring of 1986, Lynch determined that in order to remain competitive in the rapidly changing telecommunications field, it would need to obtain fiber optics technology to complement its existing digital electronic capabilities. Lynch's management identified a target company, Telco Systems, Inc. ("Telco"), which possessed both fiber optics and other valuable technological assets. The record reflects that Telco expressed interest in being acquired by Lynch. Because of the supermajority voting provision, which Alcatel had negotiated when it first purchased its shares, in order to proceed with the Telco combination Lynch needed Alcatel's consent. In June 1986, Ellsworth F. Dertinger ("Dertinger"), Lynch's CEO and chairman of its board of directors, contacted Pierre Suard ("Suard"), the chairman of Alcatel's parent company, CGE, regarding the acquisition of Telco by Lynch. Suard expressed Alcatel's opposition to Lynch's acquisition of Telco. Instead, Alcatel proposed a combination of Lynch and Celwave Systems, Inc. ("Celwave"), an indirect subsidiary of CGE engaged in the manufacture and sale of telephone wire, cable and other related products.

Alcatel's proposed combination with Celwave was presented to the Lynch board at a regular meeting held on August 1, 1986. Although several directors expressed interest in the original combination which had been proposed with Telco, the Alcatel representatives on Lynch's board made it clear that such a combination would not be considered before a Lynch/Celwave combination. According to the minutes of the August 1 meeting, Dertinger expressed his opinion that

---

**2.** The underlying facts were set forth by the Court of Chancery in its post-trial decision. This section of our opinion has relied extensively upon that recitation. Except where the context requires differentiation, this opinion will adopt the Court of Chancery's nomenclature and refer to all Alcatel affiliates as "Alcatel."

Celwave would not be of interest to Lynch if Celwave was not owned by Alcatel.

At the conclusion of the meeting, the Lynch board unanimously adopted a resolution establishing an Independent Committee, consisting of Hubert L. Kertz ("Kertz"), Paul B. Wineman ("Wineman"), and Stuart M. Beringer ("Beringer"), to negotiate with Celwave and to make recommendations concerning the appropriate terms and conditions of a combination with Celwave. On October 24, 1986, Alcatel's investment banking firm, Dillon, Read & Co., Inc. ("Dillon Read") made a presentation to the Independent Committee. Dillon Read expressed its views concerning the benefits of a Celwave/Lynch combination and submitted a written proposal of an exchange ratio of 0.95 shares of Celwave per Lynch share in a stock-for-stock merger.

However, the Independent Committee's investment advisors, Thomson McKinnon Securities Inc. ("Thomson McKinnon") and Kidder, Peabody & Co. Inc. ("Kidder Peabody"), reviewed the Dillon Read proposal and concluded that the 0.95 ratio was predicated on Dillon Read's overvaluation of Celwave. Based upon this advice, the Independent Committee determined that the exchange ratio proposed by Dillon Read was unattractive to Lynch. The Independent Committee expressed its unanimous opposition to the Celwave/Lynch merger on October 31, 1986.

Alcatel responded to the Independent Committee's action on November 4, 1986, by withdrawing the Celwave proposal. Alcatel made a simultaneous offer to acquire the entire equity interest in Lynch, constituting the approximately 57 percent of Lynch shares not owned by Alcatel. The offering price was $14 cash per share.

On November 7, 1986, the Lynch board of directors revised the mandate of the Independent Committee. It authorized Kertz, Wineman, and Beringer to negotiate the cash merger offer with Alcatel. At a meeting held that same day, the Independent Committee determined that the $14 per share offer was inadequate. The Independent's Committee's own legal counsel, Skadden, Arps, Slate, Meagher & Flom ("Skadden Arps"), suggested that the Independent Committee should review alternatives to a cash-out merger with Alcatel, including a "white knight" third party acquiror, a repurchase of Alcatel's shares, or the adoption of a shareholder rights plan.

On November 12, 1986, Beringer, as chairman of the Independent Committee, contacted Michiel C. McCarty ("McCarty") of Dillon Read, Alcatel's representative in the negotiations, with a counteroffer at a price of $17 per share. McCarty responded on behalf of Alcatel with an offer of $15 per share. When Beringer informed McCarty of the Independent Committee's view that $15 was also insufficient, Alcatel raised its offer to $15.25 per share. The Independent Committee also rejected this offer. Alcatel then made its final offer of $15.50 per share.

At the November 24, 1986 meeting of the Independent Committee, Beringer advised its other two members that Alcatel was "ready to proceed with an unfriendly tender at a lower price" if the $15.50 per share price was not recommended by the Independent Committee and approved by the Lynch board of directors. Beringer also told the other members of the Independent Committee that the alternatives to a cash-out merger had been investigated but were impracticable.[3] After meeting with its financial and legal advisors, the Independent Committee voted unanimously to recommend that the Lynch board of directors approve Alcatel's $15.50 cash per share price for a merger with Alcatel. The Lynch board met later that day. With Alcatel's nominees abstaining, it approved the merger.

*Alcatel Dominated Lynch Controlling Shareholder Status*

■ This Court has held that "a shareholder owes a fiduciary duty only if it owns a majority interest in or *exercises control* over the business affairs of the corporation."

---

3. The minutes reflect that Beringer told the Committee the "white knight" alternative "appeared impractical with the 80% approval requirement"; the repurchase of Alcatel's shares would produce a "highly leveraged company with a lower book value" and was an alternative "not in the least encouraged by Alcatel"; and a shareholder rights plan was not viable because of the increased debt it would entail.

*Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1344 (1987) (emphasis added). With regard to the exercise of control, this Court has stated:

> [A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status. For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporation conduct.

*Citron v. Fairchild Camera & Instrument Corp.,* Del.Supr., 569 A.2d 53, 70 (1989) (quotations and citation omitted).

Alcatel held a 43.3 percent minority share of stock in Lynch. Therefore, the threshold question to be answered by the Court of Chancery was whether, despite its minority ownership, Alcatel exercised control over Lynch's business affairs. Based upon the testimony and the minutes of the August 1, 1986 Lynch board meeting, the Court of Chancery concluded that Alcatel did exercise control over Lynch's business decisions.

■■ The standard of appellate review with regard to the Court of Chancery's factual findings is deferential. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 360 (1993). Those findings will not be set aside by this Court unless they are clearly erroneous or not the product of a logical and orderly deductive reasoning process. *Id.* The record supports the Court of Chancery's factual finding that Alcatel dominated Lynch.

At the August 1 meeting, Alcatel opposed the renewal of compensation contracts for Lynch's top five managers. According to Dertinger, Christian Fayard ("Fayard"), an Alcatel director, told the board members, "[y]ou must listen to us. We are 43 percent owner. You have to do what we tell you." The minutes confirm Dertinger's testimony. They recite that Fayard declared, "you are pushing us very much to take control of the company. Our opinion is not taken into consideration."

Although Beringer and Kertz, two of the independent directors, favored renewal of the contracts, according to the minutes, the third independent director, Wineman, admonished the board as follows:

> Mr. Wineman pointed out that the vote on the contracts is a "watershed vote" and the motion, due to Alcatel's "strong feelings," might not carry if taken now. Mr. Wineman clarified that "you [management] might win the battle and lose the war." With Alcatel's opinion so clear, Mr. Wineman questioned "if management wants the contracts renewed under these circumstances." He recommended that management "think twice." Mr. Wineman declared: "I want to keep the management. I can't think of a better management." Mr. Kertz agreed, again advising consideration of the "critical" period the company is entering.

The minutes reflect that the management directors left the room after this statement. The remaining board members then voted not to renew the contracts.

At the same meeting, Alcatel vetoed Lynch's acquisition of the target company, which, according to the minutes, Beringer considered "an immediate fit" for Lynch. Dertinger agreed with Beringer, stating that the "target company is extremely important as they have the products that Lynch needs now." Nonetheless, Alcatel prevailed. The minutes reflect that Fayard advised the board: "Alcatel, with its 44% equity position, would not approve such an acquisition as . . . it does not wish to be diluted from being the main shareholder in Lynch." From the foregoing evidence, the Vice Chancellor concluded:

> . . . Alcatel did control the Lynch board, at least with respect to the matters under consideration at its August 1, 1986 board meeting. The interplay between the directors was more than vigorous discussion, as suggested by defendants. The management and independent directors disagreed with Alcatel on several important issues. However, when Alcatel made its position clear, and reminded the other directors of its significant stockholdings, Alcatel prevailed. Dertinger testified that Fayard "scared [the non-Alcatel directors] to death." While this statement undoubtedly

is an exaggeration, it does represent a first-hand view of how the board operated. I conclude that the non-Alcatel directors deferred to Alcatel because of its position as a significant stockholder and not because they decided in the exercise of their own business judgment that Alcatel's position was correct [citation omitted].

The record supports the Court of Chancery's underlying factual finding that "the non-Alcatel [independent] directors deferred to Alcatel because of its position as a significant stockholder and not because they decided in the exercise of their own business judgment that Alcatel's position was correct." The record also supports the subsequent factual finding that, notwithstanding its 43.3 percent minority shareholder interest, Alcatel did exercise actual control over Lynch by dominating its corporate affairs. The Court of Chancery's legal conclusion that Alcatel owed the fiduciary duties of a controlling shareholder to the other Lynch shareholders followed syllogistically as the logical result of its cogent analysis of the record.

### Entire Fairness Requirement Dominating Interested Shareholder

■ A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983). *See Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985). The demonstration of fairness that is required was set forth by this Court in *Weinberger*:

The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one

as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

*Weinberger v. UOP, Inc.*, 457 A.2d at 711 (citations omitted).

The logical question raised by this Court's holding in *Weinberger* was what type of evidence would be reliable to demonstrate entire fairness. That question was not only anticipated but also initially addressed in the *Weinberger* opinion. *Id.* at 709–10 n. 7. This Court suggested that the result "could have been entirely different if UOP had appointed an independent negotiating committee of its outside directors to deal with Signal at arm's length," because "fairness in this context can be equated to conduct by a theoretical, wholly independent, board of directors." *Id.* Accordingly, this Court stated, "a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong *evidence* that the transaction meets the test of fairness." *Id.* (emphasis added).

In this case, the Vice Chancellor noted that the Court of Chancery has expressed "differing views" regarding the effect that an approval of a cash-out merger by a special committee of disinterested directors has upon the controlling or dominating shareholder's burden of demonstrating entire fairness. One view is that such approval shifts to the plaintiff the burden of proving that the transaction was unfair. *Citron v. E.I. Du Pont de Nemours & Co.*, Del.Ch., 584 A.2d 490, 500–02 (1990); *Rabkin v. Olin Corp*, Del.Ch., C.A. No. 7547 (Consolidated), Chandler, V.C., 1990 WL 47648, slip op. at 14–15 (Apr. 17, 1990), *reprinted in* 16 Del.J.Corp.L. 851, 861–62 (1991), *aff'd*, Del.Supr., 586 A.2d 1202 (1990). The other view is that such an approval renders the business judgment rule the applicable standard of judicial review. *In re Trans World Airlines, Inc. Shareholders Litig.*, Del.Ch., C.A. 9844 (Consolidated), Allen, C., 1988 WL 111271, slip op. at 15–16 (Oct. 21, 1988), *reprinted in* 14 Del.J.Corp.L.

870, 883 (1989).[4] *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., C.A. No. 8358, Allen, C., 1991 WL 111134, slip op. at 47–48 (June 24, 1991), *reprinted in* 17 Del. J.Corp.L. 551, 570–72 (1992), *aff'd in part and rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345 (1993).

"It is often of critical importance whether a particular decision is one to which the business judgment rule applies or the entire fairness rule applies." *Nixon v. Blackwell*, Del.Supr., 626 A.2d 1366, 1376 (1993). The definitive answer with regard to the Court of Chancery's "differing views" is found in this Court's opinions in *Weinberger* and *Rosenblatt*. In *Weinberger*, this Court held that because

> of the fairness test which has long been applicable to parent-subsidiary mergers, the expanded appraisal remedy now available to shareholders, and the broad discretion of the [Court of Chancery] to fashion such relief as the facts of a given case may dictate, we do not believe that any additional meaningful protection is afforded minority shareholders by the business purpose requirement of the trilogy of *Singer* [*v. Magnavox Co.*, Del.Supr., 380 A.2d 969 (1977)], *Tanzer* [*v. International Gen. Indus., Inc.*, Del.Supr., 379 A.2d 1121 (1977)], [*Roland Int'l Corp. v.*] *Najjar* [Del.Supr., 407 A.2d 1032 (1979)], and their progeny. Accordingly, such requirement shall no longer be of any force or effect.

*Weinberger v. UOP, Inc.*, 457 A.2d at 715 (citation and footnotes omitted). Thereafter, this Court recognized that it would be inconsistent with its holding in *Weinberger* to apply the business judgment rule in the context of an interested merger transaction which, by its very nature, did not require a business purpose. *See Rosenblatt v. Getty Oil Co.*, 493 A.2d at 937. Consequently, in *Rosenblatt*, in the context of a subsequent proceeding involving a parent-subsidiary merger, this Court held that the "approval of a merger, as here, by an informed vote of a majority of the minority stockholders, while not a legal prerequisite, shifts the burden of proving the unfairness of the merger entirely to the plaintiffs." *Id.*

 Entire fairness remains the proper focus of judicial analysis in examining an interested merger, irrespective of whether the burden of proof remains upon or is shifted away from the controlling or dominating shareholder, because the unchanging nature of the underlying "interested" transaction requires careful scrutiny. *See Weinberger v. UOP, Inc.*, 457 A.2d at 710 (citing *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 110 (1952)). The policy rationale for the exclusive application of the entire fairness standard to interested merger transactions has been stated as follows:

> Parent subsidiary mergers, unlike stock options, are proposed by a party that controls, and will continue to control, the corporation, whether or not the minority stockholders vote to approve or reject the transaction. The controlling stockholder relationship has the potential to influence, however subtly, the vote of [ratifying] minority stockholders in a manner that is not likely to occur in a transaction with a noncontrolling party.
>
> Even where no coercion is intended, shareholders voting on a parent subsidiary merger might perceive that their disapproval could risk retaliation of some kind by the controlling stockholder. For example, the controlling stockholder might decide to stop dividend payments or to effect a subsequent cash out merger at a less favorable price, for which the remedy would be time consuming and costly litigation. At the very least, the potential for that perception, and its possible impact upon a shareholder vote, could never be fully eliminated. Consequently, in a merger between the corporation and its controlling stockholder—even one negotiated by disinterested, independent directors—no court could be certain whether the transaction terms fully approximate what truly independent parties would have achieved in an arm's length negotiation. Given that uncertainty, a court might well conclude

---

4. We note that the Court of Chancery opinion in *Trans World Airlines, Inc.* did not cite *Rosenblatt*.

*See Citron v. E.I. Du Pont de Nemours & Co.*, Del.Ch., 584 A.2d 490, 501 n. 15 (1990).

that even minority shareholders who have ratified a ... merger need procedural protections beyond those afforded by full disclosure of all material facts. One way to provide such protections would be to adhere to the more stringent entire fairness standard of judicial review.

*Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d at 502.

 Once again, this Court holds that the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness. *Weinberger v. UOP, Inc.*, 457 A.2d at 710–11.[5] The initial burden of establishing entire fairness rests upon the party who stands on both sides of the transaction. *Id.* However, an approval of the transaction by an independent committee of directors or an informed majority of minority shareholders shifts the burden of proof on the issue of fairness from the controlling or dominating shareholder to the challenging shareholder-plaintiff. *See Rosenblatt v. Getty Oil Co.*, 493 A.2d at 937–38. Nevertheless, even when an interested cash-out merger transaction receives the informed approval of a majority of minority stockholders or an independent committee of disinterested directors, an entire fairness analysis is the only proper standard of judicial review. *See id.*

### Independent Committees
### Interested Merger Transactions

 It is a now well-established principle of Delaware corporate law that in an interested merger, the controlling or dominating shareholder proponent of the transaction bears the burden of proving its entire fairness. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710–11 (1983). It is equally well-established in such contexts that any shifting of the burden of proof on the issue of entire fairness must be predicated upon this Court's decisions in *Rosenblatt v. Getty Oil*

*Co.*, Del.Supr., 493 A.2d 929 (1985) and *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983). In *Weinberger,* this Court noted that "[p]articularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had *in fact* exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness." 457 A.2d at 709–10 n. 7 (emphasis added). *Accord Rosenblatt v. Getty Oil Co.*, 493 A.2d at 937–38 & n. 7. In *Rosenblatt,* this Court pointed out that "[an] independent bargaining structure, while not conclusive, is strong evidence of the fairness" of a merger transaction. *Rosenblatt v. Getty Oil Co.*, 493 A.2d at 938 n. 7.

The same policy rationale which requires judicial review of interested cash-out mergers exclusively for entire fairness also mandates careful judicial scrutiny of a special committee's real bargaining power before shifting the burden of proof on the issue of entire fairness. A recent decision from the Court of Chancery articulated a two-part test for determining whether burden shifting is appropriate in an interested merger transaction. *Rabkin v. Olin Corp.*, Del.Ch., C.A. No. 7547 (Consolidated), Chandler, V.C., 1990 WL 47648, slip op. at 14–15 (Apr. 17, 1990), *reprinted in* 16 Del.J.Corp.L. 851, 861–62 (1991), *aff'd,* Del.Supr., 586 A.2d 1202 (1990). In *Olin,* the Court of Chancery stated:

> The mere existence of an independent special committee ... does not itself shift the burden. At least two factors are required. First, the majority shareholder must not dictate the terms of the merger. *Rosenblatt v. Getty Oil Co.*, Del.Ch., 493 A.2d 929, 937 (1985). Second, the special committee must have real bargaining power that it can exercise with the majority shareholder on an arms length basis.

*Id.,* slip op. at 14–15, 16 Del.J.Corp.L. at 861–62.[6] This Court expressed its agree-

---

5. *See* Block, Barton & Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 185–88 (4th ed. 1993) (discussing the applications of the business judgment rule to parent-subsidiary transactions other than cash-out mergers).

6. In *Olin,* the Court of Chancery concluded that because the special committee had been given "the narrow mandate of determining the monetary fairness of a non-negotiable offer," and because the majority shareholder "dictated the terms" and "there were no arm's-length negotiations," the burden of proof on the issue of entire

ment with that statement by affirming the Court of Chancery decision in *Olin* on appeal.

### Lynch's Independent Committee

■ In the case *sub judice*, the Court of Chancery observed that although "Alcatel did exercise control over Lynch with respect to the decisions made at the August 1, 1986 board meeting, it does not necessarily follow that Alcatel also controlled the terms of the merger and its approval." This observation is theoretically accurate, as this opinion has already stated. *Weinberger v. UOP, Inc.,* 457 A.2d at 709–10 n. 7. However, the performance of the Independent Committee merits careful judicial scrutiny to determine whether Alcatel's demonstrated pattern of domination was effectively neutralized so that "each of the contending parties had in fact exerted its bargaining power against the other at arm's length." *Id.* The fact that the same independent directors had submitted to Alcatel's demands on August 1, 1986 was part of the basis for the Court of Chancery's finding of Alcatel's domination of Lynch. Therefore, the Independent Committee's ability to bargain at arm's length with Alcatel was suspect from the outset.

The Independent Committee's original assignment was to examine the merger with Celwave which had been proposed by Alcatel. The record reflects that the Independent Committee effectively discharged that assignment and, in fact, recommended that the Lynch board reject the merger on Alcatel's terms. Alcatel's response to the Independent Committee's adverse recommendation was not the pursuit of further negotiations regarding its Celwave proposal, but rather its response was an offer to buy Lynch. That offer was consistent with Alcatel's August 1, 1986 expressions of an intention to dominate Lynch, since an acquisition would effectively eliminate once and for all Lynch's remaining vestiges of independence.

The Independent Committee's second assignment was to consider Alcatel's proposal to purchase Lynch. The Independent Committee proceeded on that task with full knowledge of Alcatel's demonstrated pattern of domination. The Independent Committee was also obviously aware of Alcatel's refusal to negotiate with it on the Celwave matter.

### Burden of Proof Shifted
### Court of Chancery's Finding

The Court of Chancery began its factual analysis by noting that Kahn had "attempted to shatter" the image of the Independent Committee's actions as having "appropriately simulated" an arm's length, third-party transaction. The Court of Chancery found that "to some extent, [Kahn's attempt] was successful." The Court of Chancery gave credence to the testimony of Kertz, one of the members of the Independent Committee, to the effect that he did not believe that $15.50 was a fair price but that he voted in favor of the merger because he felt there was no alternative.

The Court of Chancery also found that Kertz understood Alcatel's position to be that it was ready to proceed with an unfriendly tender offer at a lower price if Lynch did not accept the $15.50 offer, and that Kertz perceived this to be a threat by Alcatel. The Court of Chancery concluded that Kertz ultimately decided that, "although $15.50 was not fair, a tender offer and merger at that price would be better for Lynch's stockholders than an unfriendly tender offer at a significantly lower price." The Court of Chancery determined that "Kertz failed either to satisfy himself that the offered price was fair or oppose the merger."

In addition to Kertz, the other members of the Independent Committee were Beringer, its chairman, and Wineman. Wineman did not testify at trial.[7] Beringer was called by

---

fairness remained with the defendants. *Id.,* slip op. at 15, 16 Del.J.Corp.L. at 862. In making that determination, the Court of Chancery pointed out that the majority shareholder "could obviously have used its majority stake to effectuate the merger" regardless of the committee's or the board's disapproval, and that the record demonstrated that the directors of both corporations

were "acutely aware of this fact." *Id.,* slip op. at 13, 16 Del.J.Corp.L. at 861.

**7.** Based upon inferences from Kertz's testimony, the Court of Chancery noted that "Wineman apparently agreed" that $15.50 was a fair price. However, the record also reflects that it was Wineman who urged the other independent di-

Alcatel to testify at trial. Beringer testified that at the time of the Committee's vote to recommend the $15.50 offer to the Lynch board, he thought "that *under the circumstances,* a price of $15.50 was fair and should be accepted" (emphasis added).

Kahn contends that these "circumstances" included those referenced in the minutes for the November 24, 1986 Independent Committee meeting: "Mr. Beringer added that Alcatel is 'ready to proceed with an unfriendly tender at a lower price' if the $15.50 per share price is not recommended to, and approved by, the Company's Board of Directors." In his testimony at trial, Beringer verified, albeit reluctantly, the accuracy of the foregoing statement in the minutes: "[Alcatel] *let us know* that they were giving serious consideration to making an unfriendly tender" (emphasis added).

The record reflects that Alcatel was "ready to proceed" with a hostile bid. This was a conclusion reached by Beringer, the Independent Committee's chairman and spokesman, based upon communications to him from Alcatel. Beringer testified that although there was no reference to a particular price for a hostile bid during his discussions with Alcatel, or even specific mention of a "lower" price, "the implication was clear to [him] that it probably would be at a lower price."[8]

According to the Court of Chancery, the Independent Committee rejected three lower offers for Lynch from Alcatel and then accepted the $15.50 offer "after being advised that [it] was fair and after considering the absence of alternatives." The Vice Chancellor expressly acknowledged the impracticability of Lynch's Independent Committee's alternatives to a merger with Alcatel:

Lynch was not in a position to shop for other acquirors, since Alcatel could block any alternative transaction. Alcatel also made it clear that it was not interested in having its shares repurchased by Lynch. The Independent Committee decided that a stockholder rights plan was not viable because of the increased debt it would entail.

Nevertheless, based upon the record before it, the Court of Chancery found that the Independent Committee had "appropriately simulated a third-party transaction, where negotiations are conducted at arms-length and there is no compulsion to reach an agreement." The Court of Chancery concluded that the Independent Committee's actions "as a whole" were "sufficiently well informed ... and aggressive to simulate an arms-length transaction," so that the burden of proof as to entire fairness shifted from Alcatel to the contending Lynch shareholder, Kahn. The Court of Chancery's reservations about that finding are apparent in its written decision.

*The Power to Say No,*
*The Parties' Contentions,*
*Arm's Length Bargaining*

The Court of Chancery properly noted that limitations on the alternatives to Alcatel's offer did not mean that the Independent Committee should have agreed to a price that was unfair:

The power to say no is a significant power. It is the duty of directors serving on [an independent] committee to approve only a transaction that is in the best interests of the public shareholders, to say no to any transaction that is not fair to those shareholders and is not the best transaction available. It is not sufficient for such directors to achieve the best price that a fiduciary will pay if that price is not a fair price.

(Quoting *In re First Boston, Inc. Shareholders Litig.,* Del.Ch., C.A. 10338 (Consolidated),

---

rectors to yield to Alcatel's demands at the August 1, 1986 meeting.

Wineman's failure to testify also permits both this Court and the Court of Chancery to draw the inference adverse to Alcatel, that Alcatel dictated the outcome of the November 24, 1986 meeting. As we have previously noted, the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse. *See Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 878 (1985).

8. On the other hand, Dertinger, an officer and director of Lynch, testified that he was informed by Alcatel that the price of an unfriendly tender offer would indeed be lower and would in fact be $12 per share.

Allen, C., 1990 WL 78836, slip op. at 15–16 (June 7, 1990)).

The Alcatel defendants argue that the Independent Committee exercised its "power to say no" in rejecting the three initial offers from Alcatel, and that it therefore cannot be said that Alcatel dictated the terms of the merger or precluded the Independent Committee from exercising real bargaining power. *Compare Rabkin v. Olin Corp.*, Del.Ch., C.A. 7547 (Consolidated), Chandler, V.C., 1990 WL 47648, slip op. at 14–15 (Apr. 17, 1990), *reprinted in* 16 Del.J.Corp.L. 851, 861–62 (1991), *aff'd*, Del.Supr., 586 A.2d 1202 (1990).[9] The Alcatel defendants contend, alternatively, that "even assuming that such a threat [of a hostile takeover] could have had a coercive effect on the [Independent] Committee," the willingness of the Independent Committee to reject Alcatel's initial three offers suggests that "the alleged threat was either nonexistent or ineffective." *Braunschweiger v. American Home Shield Corp.*, Del.Ch., C.A. No. 10755, Allen, C., 1991 WL 3920, slip op. at 13 (Jan. 7, 1991), *reprinted in* 17 Del.J.Corp.L. 206, 219 (1992).

Kahn contends the record reflects that the conduct of Alcatel deprived the Independent Committee of an effective "power to say no." Kahn argues that Alcatel not only threatened the Committee with a hostile tender offer in the event its $15.50 offer was not recommended and approved, but also directed the affairs of Lynch for Alcatel's benefit in such a way as to make it impossible for Lynch to continue as a public company under Alcatel's control without injury to itself and its minority shareholders. In support of this argument, Kahn relies upon another proceeding wherein the Court of Chancery has been previously presented with factual circumstances comparable to those of the case *sub judice*, albeit in a different procedural posture. *See American Gen. Corp. v. Texas Air Corp.*, Del.Ch., C.A. Nos. 8390, 8406, 8650 & 8805, Hartnett, V.C., 1987 WL 6337 (Feb. 5, 1987), *reprinted in* 13 Del.J.Corp.L. 173 (1988).

In *American General*, in the context of an application for injunctive relief, the Court of Chancery found that the members of the Special Committee were "truly independent and ... performed their tasks in a proper manner," but it also found that "at the end of their negotiations with [the majority shareholder] the Committee members were issued an ultimatum and told that they must accept the $16.50 per share price or [the majority shareholder] would proceed with the transaction without their input." *Id.*, slip op. at 11–12, 13 Del.J.Corp.L. at 181. The Court of Chancery concluded based upon this evidence that the Special Committee had thereby lost "its ability to negotiate in an armslength manner" and that there was a reasonable probability that the burden of proving entire fairness would remain on the defendants if the litigation proceeded to trial. *Id.*, slip op. at 12, 13 Del.J.Corp.L. at 181.

Alcatel's efforts to distinguish *American General* are unpersuasive. Alcatel's reliance on *Braunschweiger* is also misplaced. In *Braunschweiger*, the Court of Chancery pointed out that "[p]laintiffs do not allege that [the management-affiliated merger partner] ever used the threat of a hostile takeover to influence the special committee." *Braunschweiger v. American Home Shield Corp.*, slip op. at 13, 17 Del.J.Corp.L. at 219. Unlike *Braunschweiger*, in this case the coercion was extant and directed to a specific price offer which was, in effect, presented in the form of a "take it or leave it" ultimatum by a controlling shareholder with the capability of following through on its threat of a hostile takeover.

### Alcatel's Entire Fairness Burden Did Not Shift to Kahn

■ A condition precedent to finding that the burden of proving entire fairness has shifted in an interested merger transaction is a careful judicial analysis of the factual circumstances of each case. Particular consideration must be given to evidence of whether the special committee was truly independent, fully informed, and had the freedom to nego-

---

**9.** Alcatel also points to the fairness opinions of two investment banking firms employed by the Committee, Kidder Peabody and Thomson McKinnon, and the involvement of independent legal counsel, Skadden Arps, in considering and rejecting alternatives to the Alcatel cash offers.

tiate at arm's length. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 709–10 n. 7 (1983). *See also American Gen. Corp. v. Texas Air Corp.*, Del.Ch., C.A. Nos. 8390, 8406, 8650 & 8805, Hartnett, V.C., 1987 WL 6337, slip op. at 11 (Feb. 5, 1987), *reprinted in* 13 Del.J.Corp.L. 173, 181 (1988). "Although perfection is not possible," unless the controlling or dominating shareholder can demonstrate that it has not only formed an independent committee but also replicated a process "as though each of the contending parties had in fact exerted its bargaining power at arm's length," the burden of proving entire fairness will not shift. *Weinberger v. UOP, Inc.*, 457 A.2d at 709–10 n. 7. *See also Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937–38 (1985).

■ Subsequent to *Rosenblatt*, this Court pointed out that "the use of an independent negotiating committee of outside directors may have significant advantages to the majority stockholder in defending suits of this type," but it does not *ipso facto* establish the procedural fairness of an interested merger transaction. *Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099, 1106 & n. 7 (1985). In reversing the granting of the defendants' motion to dismiss in *Rabkin*, this Court implied that the burden on entire fairness would not be shifted by the use of an independent committee which concluded its processes with "what could be considered a quick surrender" to the dictated terms of the controlling shareholder.[10] *Id.* at 1106. This Court concluded in *Rabkin* that the majority stockholder's "attitude toward the minority,"

coupled with the "apparent absence of any meaningful negotiations as to price," did not manifest the exercise of arm's length bargaining by the independent committee. *Id.*

The Court of Chancery's determination that the Independent Committee "appropriately simulated a third-party transaction, where negotiations are conducted at arm's-length and there is no compulsion to reach an agreement," is not supported by the record. Under the circumstances present in the case *sub judice*, the Court of Chancery erred in shifting the burden of proof with regard to entire fairness to the contesting Lynch shareholder-plaintiff, Kahn. The record reflects that the ability of the Committee effectively to negotiate at arm's length was compromised by Alcatel's threats to proceed with a hostile tender offer if the $15.50 price was not approved by the Committee and the Lynch board. The fact that the Independent Committee rejected three initial offers, which were well below the Independent Committee's estimated valuation for Lynch and were not combined with an explicit threat that Alcatel was "ready to proceed" with a hostile bid, cannot alter the conclusion that any semblance of arm's length bargaining ended when the Independent Committee surrendered to the ultimatum that accompanied Alcatel's final offer. *See Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099, 1106 (1985).

*Conclusion*

Accordingly, the judgment of the Court of Chancery is reversed. This matter is re-

---

10. A "surrender" need not occur at the outset of the negotiation process in order to deny a controlling shareholder the burden-shifting function which might otherwise follow from establishing an independent committee bargaining structure. *See Freedman v. Restaurant Assocs. Indus., Inc.*, Del. Ch., C.A. No. 9212, Allen, C., 1990 WL 135923 (Sept. 19, 1990), *reprinted in* 16 Del. J.Corp.L. 1462 (1991). *See also* Block, Barton & Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 170–72 (4th ed. 1993). In *Freedman*, finding that there was no "fully functional" independent committee, the Court of Chancery stated:

[F]acts are alleged that would establish that [the] special committee was not given the op-

portunity to select from among the range of alternatives that an independent, disinterested board would have had available to it; it was, in effect, 'hemmed in' by the management group's actions. Under these circumstances, where, according to the allegations contained in the amended complaint, the management group could (and did) veto any action of the special committee that was not agreeable to the conflicted interests of the management directors it would be formalistically perverse to afford the special committee's action the effect of burden shifting of which that device is capable.

*Freedman v. Restaurant Assocs. Indus., Inc.*, slip op. at 17–18, 16 Del.J.Corp.L. at 1475.

manded for further proceedings consistent herewith, including a redetermination of the entire fairness of the cash-out merger to Kahn and the other Lynch minority shareholders with the burden of proof remaining on Alcatel, the dominant and interested shareholder.