INMAN, Judge.
 

 *46
 
 In this case of first impression, reviewing the sufficiency of the pleadings to state a claim for relief, we hold that a minority shareholder which owns shares eight times greater than any other shareholder, is the sole source of equity financing for a transformative corporate transaction, has a contractual right to prohibit the issuance of shares and the sale of intellectual property necessary for the transaction, and which pledges support for the transaction contingent on terms more favorable to it than to other shareholders may owe a fiduciary duty to other
 
 *47
 
 shareholders who claim they were harmed by the transaction. We also hold that claims for diminished share value and diluted voting power, as alleged in this case, cannot be the basis for a direct claim against a board of directors.
 

 Dr. Robert Corwin ("Plaintiff"), acting as trustee for the Beatrice Corwin Living Irrevocable Trust, on behalf of a Class of Shareholders so similarly situated, appeals from an Order and Opinion in favor of Defendants-British American Tobacco PLC ("Defendant-Shareholder" or "BAT" or "British American") and Reynolds American, Inc. ("Defendant-Corporation" or "RAI" or "Reynolds") and Susan M. Cameron, John P. Daly, Neil R. Withington, Luc Jobin, Sir Nicholas Scheele, Martin D. Feinstein, Ronald S. Rolfe, Richard E. Thornburgh, Holly K. Koeppel, Nana Mensah, Lionel L. Nowell III, John J. Zillmer, and Thomas C. Wajnert (collectively "Defendant-Directors" or "Reynolds Board of Directors") dismissing Plaintiff's claims for breach of a fiduciary duty and aiding and abetting a breach of fiduciary duty.
 

 This appeal presents three issues: (1) whether a minority shareholder may be a controlling shareholder, and thus, owe a fiduciary duty to other shareholders; (2) whether a shareholder is permitted to bring a direct suit against a board of directors for the loss of value and voting power of the shareholder's shares; and (3) whether a shareholder may bring a claim for aiding and abetting a breach of fiduciary duty against a corporation based on the actions of the corporation's board of directors. After careful review, we hold that a minority shareholder may in certain circumstances control a corporation, and thus, owe the other shareholders a fiduciary duty. We also hold that Plaintiff does not have standing to bring a direct suit against the corporation's board of directors for his shares' loss of value and voting power alone. Finally, we hold that without an underlying claim against the board of directors for a breach of fiduciary duty, Plaintiff cannot assert a claim of aiding and abetting for breach of a fiduciary duty against the corporation. Accordingly, we reverse and remand the trial court's order in part and affirm the trial court's order in part.
 

 Factual and Procedural History
 

 This dispute arises out of a merger (the "Transaction") between Reynolds and Lorillard, Inc. ("Lorillard"), funded in part by an equity financing share purchase by Defendant-Corporation's largest shareholder, British American. The following facts are alleged in Plaintiff's Amended Complaint and are accepted as true for purposes of our review.
 

 *48
 
 In 2004, R.J. Reynolds Tobacco Company acquired British American's U.S. subsidiary, Brown & Williamson, and formed a successor entity, Reynolds American Inc., in which British American took a forty-two percent stake. In connection with this acquisition, British American and Reynolds adopted a Governance Agreement (the "Governance Agreement") on 30 July 2004. The Governance Agreement included a standstill provision ("the Standstill provision"), which prevented British American from increasing its
 
 *328
 
 percentage ownership in Reynolds for ten years, until 30 July 2014. The Governance Agreement also limited British American's ability to control Reynolds by: (1) permitting British American to designate no more than five of the thirteen board members of Reynolds, (2) requiring British American to vote its shares in favor of any board candidates selected by a Corporate Governance and Nominating Committee, comprised solely of non-British American designees, and (3) requiring non-British American designees to approve of any entrance into a contract between British American and Reynolds or any of their subsidiaries. The Governance Agreement also provided contractual rights to British American, including granting British American the right to prohibit the sale or transfer of certain intellectual property, veto amendments to the Articles of Incorporation and By-laws and adoptions of any takeover defenses, and approve the issuance of equity securities in an amount of five percent or more of the voting power of outstanding shares. The Governance Agreement terminates when British American's ownership share in Reynolds reaches one-hundred percent, drops below fifteen percent, or if a third party acquires a majority stake in Reynolds.
 

 In or around September 2012, the Reynolds board of directors, together with Reynolds senior management, began contemplating a merger with Lorillard as a means of alternative strategic growth. Before approaching Lorillard, the president and chief executive officer and a director of Reynolds met with representatives of British American to discuss, among other things, the potential merger. On 15 November 2012, Reynolds formally expressed to Lorillard its interest in a merger, and negotiations ensued.
 

 Throughout the negotiations process, British American insisted that it would support the Transaction only on terms that would allow it to maintain its forty-two percent ownership in Reynolds. British American also insisted-and Reynolds agreed-that neither British American nor Reynolds would seek to amend the Governance Agreement in connection with the Transaction. The Standstill provision in the Governance Agreement was scheduled to expire on 30 July 2014; without changing
 
 *49
 
 that provision or extending the expiration date, Reynolds ultimately could not prevent British American from taking control of Reynolds through the purchase of the remaining fifty-eight percent of Reynolds's outstanding shares.
 

 In February 2014, Lorillard expressed concerns over the proposed terms of the Transaction and sought an additional ownership percentage for the Lorillard shareholders following the merger. Reynolds directors not designated by British American (the "Other Directors") expressed that any additional equity provided to Lorillard should come from a reduction of British American's ownership as opposed to a reduction of the non-British American shareholders' ownership. However, the Other Directors acknowledged that British American's ownership share would not be decreased without British American's consent.
 

 By March 2014, the Lorillard Board of Directors determined the proposed terms did not reflect a "merger-of-equals," decided not to proceed with the Transaction, and terminated the related discussions with Reynolds. Reynolds senior management then explored the possibility of acquiring Lorillard at a premium. With British American as the equity financing source, Reynolds and Lorillard reopened negotiations for the Transaction.
 

 In July 2014, the Reynolds Board of Directors unanimously approved the Transaction. Lorillard's shares were to be purchased for a price per share of $50.50 in cash, plus 0.2909 shares of Reynolds stock. The cash portion of the Transaction was financed by the sale of Reynolds stock to British American at a price of $60.16 per share for a total of approximately $4.7 billion. This price was $3.02 less than the fair market value of the shares on the date of approval by the Reynolds Board of Directors. This sale assured that British American would maintain its forty-two percent ownership share in the remaining company following the Transaction.
 

 When the Transaction closed in June 2015, Reynolds stock was publicly trading at $72 per share, or $11.84 greater per share than the price British American paid for its additional stock as part of the Transaction. The post-closing value constituted a profit of approximately
 
 *329
 
 $920 million for British American, a profit no other shareholder enjoyed.
 

 Plaintiff filed suit in August 2014 in Guilford County Superior Court, just after the Reynolds Board of Directors approved the Transaction. The case was assigned to the North Carolina Business Court ("trial court") with Chief Special Superior Court Judge for Complex Business Cases James L. Gale presiding. Following Reynolds's filing of a Form S-4 (the "Proxy Statement") with the Securities and Exchange Commission
 
 *50
 
 describing the Transaction, Plaintiff filed its First Amended Class Action Complaint ("Amended Complaint"), which is the operative pleading at issue on appeal.
 

 The Amended Complaint alleged two theories seeking relief, "Fairness Claims" and "Disclosure Claims." The Fairness Claims alleged that British American and Defendant-Directors breached their fiduciary duties to the Public Shareholders, and the Disclosure Claims alleged that Defendant-Directors breached their duties of candor by failing to disclose certain material facts in the Proxy Statement. The Fairness Claims also included an aiding and abetting a breach of fiduciary duty claim against Reynolds for the actions of Defendant-Directors.
 

 In December 2014, Defendants moved to dismiss the case pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The parties settled the Disclosure Claims in a Memorandum of Understanding filed in January 2015. However, the Fairness Claims remained pending.
 

 Following a hearing, in an Order and Opinion entered 6 August 2015, the trial court dismissed Plaintiff's Fairness Claims. The trial court held that (1) the Amended Complaint did not sufficiently plead facts necessary to establish British American as a controlling shareholder, and consequently did not sufficiently plead that British American owed a fiduciary duty to the other shareholders; (2) regardless of whether Plaintiff had standing to bring a direct suit against Defendant-Directors, Plaintiff's Amended Complaint failed to overcome the Business Judgment Rule and therefore the claim against Defendant-Directors did not survive; and (3) because the underlying fiduciary duty claims had been dismissed, the aiding and abetting claim against Reynolds necessarily failed.
 

 Plaintiff timely appealed.
 

 Analysis
 

 Plaintiff contends that the trial court erred in granting Defendants' motions to dismiss under Rules 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim upon which relief may be granted. After careful examination of the Amended Complaint and documents incorporated therein, we reverse the trial court's order dismissing Plaintiff's claim against British American and affirm the trial court's dismissal of Plaintiff's remaining claims.
 

 A. Standard of Review
 

 The standard of review of an order granting a 12(b)(6) motion is whether the complaint states a claim for which
 
 *51
 
 relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true. On a motion to dismiss, the complaint's material factual allegations are taken as true. Legal conclusions, however, are not entitled to a presumption of validity. Dismissal is proper when one of the following three conditions is satisfied: (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.
 

 Wells Fargo Bank, N.A. v. Corneal
 
 ,
 
 238 N.C.App. 192
 
 , 195,
 
 767 S.E.2d 374
 
 , 377 (2014) (quoting
 
 Guyton v. FM Lending Servs., Inc.
 
 ,
 
 199 N.C.App. 30
 
 , 33,
 
 681 S.E.2d 465
 
 , 469 (2009) ). We review the pleadings
 
 de novo
 
 to determine whether Plaintiff has stated a claim for which relief can be granted.
 
 Burgin v. Owen
 
 ,
 
 181 N.C.App. 511
 
 , 512,
 
 640 S.E.2d 427
 
 , 429 (2007) (citation omitted).
 

 Included in the pleadings reviewed for purposes of deciding a motion to dismiss are documents attached to and incorporated by reference in the plaintiff's complaint. N.C. Gen. Stat. § 1A-1, Rule 10(c) (2015) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").
 

 *330
 
 In this case, incorporated documents include the Governance Agreement and the Proxy Statement. Central to the parties' dispute is the interpretation of these documents.
 

 B. Minority Shareholder Liability
 

 1. Controlling Shareholder
 

 Plaintiff's claim raises an issue of first impression in North Carolina: whether and under what circumstances a minority shareholder can be classified as a "controlling shareholder" owing a fiduciary duty to other shareholders.
 
 [1]
 
 We hold that a minority shareholder exercising actual control over a corporation may be deemed a "controlling shareholder" with a concomitant fiduciary duty to the other shareholders.
 

 In North Carolina, an individual shareholder generally does not owe a fiduciary duty to the corporation or to the other shareholders.
 
 Freese v. Smith
 
 ,
 
 110 N.C.App. 28
 
 , 37,
 
 428 S.E.2d 841
 
 , 847 (1993) (citation
 
 *52
 
 omitted). "An exception to this rule is that a controlling shareholder owes a fiduciary duty to minority shareholders."
 
 Kaplan v. O.K. Techs., LLC
 
 ,
 
 196 N.C.App. 469
 
 , 473,
 
 675 S.E.2d 133
 
 , 137 (2009) (citation omitted) (comparing members of a limited liability company to shareholders of a corporation);
 
 Freese
 
 ,
 
 110 N.C.App. at 37
 
 ,
 
 428 S.E.2d at 847
 
 ("[I]t is well established that a controlling shareholder owes a fiduciary duty to minority shareholders.").
 

 North Carolina courts have held that shareholders owning a controlling number of shares in a corporation owe a special duty to other shareholders in the same corporation. In
 
 Gaines v. Long Mfg. Co.
 
 ,
 
 234 N.C. 340
 
 ,
 
 67 S.E.2d 350
 
 (1951), the North Carolina Supreme Court upheld a minority shareholder's ability to sue majority shareholders for breach of a fiduciary duty arising from a disputed corporate transaction. The court explained:
 

 The holders of the majority of the stock of a corporation have the power, by the election of directors and by the vote of their stock, to do everything that the corporation can do. Their power to ... direct the action of the corporation places them in its shoes and constitutes them the actual, if not the technical, trustees for the holders of the minority of the stock.... It is
 
 the fact of control
 
 of the common property held and exercised, and
 
 not the particular means
 
 by which or manner in which the control is exercised, that creates the fiduciary obligation on the part of the majority stockholders in a corporation for the minority holders.
 

 Gaines
 
 ,
 
 234 N.C. at 344-45
 
 ,
 
 67 S.E.2d at 353-54
 
 (first alteration in original) (quoting Am. Jur., Corporations, sections 422 and 423, pp. 474-76 ) (emphasis added).
 

 Gaines
 
 relied on a North Carolina Supreme Court decision holding: " 'the directors of these corporate bodies are to be considered and dealt with as trustees in respect to their corporate management, and [ ]this same principle has been applied to a majority,
 
 or other controlling number
 
 , of stockholders in reference to the rights of the minority ... when they are as a body in the exercise of this control, in the management and direction of corporate affairs....' "
 
 Id.
 
 at 345,
 
 67 S.E.2d at 353
 
 (emphasis added) (quoting
 
 White v. Kincaid
 
 ,
 
 149 N.C. 415
 
 ,
 
 63 S.E. 109
 
 , 111 (1908) ). The Court in
 
 White
 
 reasoned that a fiduciary duty arises when a "controlling number of stockholders are exercising their authority in dictating the action of the directors, thereby causing a breach of
 
 *53
 
 fiduciary duty."
 
 White
 
 ,
 
 149 N.C. at 420
 
 ,
 
 63 S.E. at 111
 
 (internal quotation marks omitted).
 
 [2]
 

 Our courts have not previously classified a numerical minority shareholder, acting alone in either a closely held or publicly traded company, as a "controlling shareholder" for the purpose of imposing a fiduciary duty. However, this Court has held that individual
 
 *331
 
 minority shareholders working in concert as a majority to exercise control over a corporation to the detriment of the other shareholders could be held liable as fiduciaries.
 
 Loy v. Lorm Corp.
 
 ,
 
 52 N.C.App. 428
 
 ,
 
 278 S.E.2d 897
 
 (1981). In
 
 Loy
 
 , this Court held the trial court erred in directing a verdict for the defendants-three shareholders with an aggregate seventy-five percent interest in a corporation-who were sued by the fourth shareholder after transferring corporate assets to another corporation owned solely by the defendants themselves.
 
 Id.
 
 at 435,
 
 278 S.E.2d at 902-03
 
 . The court in
 
 Loy
 
 looked beyond the percentage of shares owned by each of the three defendants to consider the control each of them derived from their concerted action.
 

 Id.
 

 No North Carolina appellate court decision or statute has determined if and when a single minority shareholder can become a "controlling shareholder" with an accompanying fiduciary duty. So we consider other authorities.
 

 North Carolina courts often look to Delaware courts for guidance regarding unsettled business law issues.
 
 Energy Investors Fund, L.P. v. Metric Constructors, Inc.
 
 ,
 
 351 N.C. 331
 
 , 334,
 
 525 S.E.2d 441
 
 , 443 (2000) (following Delaware courts' proposition "that shareholders and limited partners hold similar positions within their respective entities[ ]");
 
 Ehrenhaus v. Baker
 
 ,
 
 216 N.C.App. 59
 
 , 88,
 
 717 S.E.2d 9
 
 , 28 (2011) (finding "the Delaware courts' articulation of the non-disclosure principle persuasive[,]" and adopting this articulated principle in North Carolina).
 

 Delaware decisional law allows a minority shareholder who exercises actual control over a corporation or a corporation's affairs to be classified as a "controlling shareholder." However, this law includes the rebuttable presumption that a minority shareholder does not control
 
 *54
 
 a corporation or a challenged corporate transaction. "[A] shareholder who owns less than [fifty percent] of a corporation's outstanding stocks does not,
 
 without more
 
 , become a controlling shareholder of that corporation, with a concomitant fiduciary status."
 
 Citron v. Fairchild Camera and Instrument Corp.
 
 ,
 
 569 A.2d 53
 
 , 70 (Del. 1989) (first alteration in original) (emphasis added) (internal quotation marks and citations omitted). It therefore becomes necessary for the plaintiff to "allege domination by a minority shareholder through actual control of corporate conduct."
 

 Id.
 

 ;
 
 see also
 

 Kahn v. Lynch Commc'n Systems, Inc.
 
 ,
 
 638 A.2d 1110
 
 , 1115 (Del. 1994) (holding that a minority shareholder with an approximate forty-three percent interest in a company exercised control sufficient to impose a fiduciary duty).
 

 When determining if a shareholder has exercised control over a corporation, our courts and Delaware courts have considered, among other things, the shareholder's percentage of voting shares, the relationship between the shareholder and the corporation, the shareholder's ability to appoint directors, and the shareholder's ability to affect the outcome of particular transactions.
 
 See, e.g.,
 

 Kaplan
 
 ,
 
 196 N.C.App. at 473
 
 ,
 
 675 S.E.2d at
 
 137 ;
 
 Kahn
 
 ,
 
 638 A.2d at
 
 1113-15 ;
 
 and
 

 Williams v. Cox Commc'ns, Inc.
 
 , 2006 Del. Ch. LEXIS 111 *1, *22 (Del. Ch. June 5, 2006). The plaintiff in
 
 Kahn
 
 appealed from a final judgment in which the Delaware Chancery Court concluded a minority shareholder owed a fiduciary duty to the plaintiff, but that the evidence did not demonstrate that the defendant breached this duty.
 
 Kahn
 
 ,
 
 638 A.2d at 1111-12
 
 . The Delaware Supreme Court, affirming the Chancery Court, held that a minority shareholder whose designated director told the other board members that "[y]ou must listen to us. We are 43 percent owner. You have to do what we tell you[,]" and persuaded the board members to abandon their opposing votes in a "watershed vote," was a controlling shareholder who owed a fiduciary duty to the other shareholders.
 

 Id.
 

 at 1114
 
 (first alteration in original).
 

 A review of secondary authorities supports treating a minority shareholder as a "controlling shareholder" under certain circumstances. Black's Law Dictionary defines a controlling shareholder as "[a] shareholder who can influence the corporation's activities because the shareholder either owns a majority of outstanding shares or
 
 owns a smaller percentage but a significant number of the remaining shares are widely distributed among many others
 
 ."
 
 Black's Law Dictionary
 

 *332
 
 1586 (10th ed. 2014) (emphasis added). The American Law Institute, in its
 
 Principles of Corporate Governance
 
 , applies the following definition:
 

 *55
 
 (a) A "controlling shareholder" means a person [§ 1.28] who, either alone or pursuant to an arrangement or understanding with one or more persons:
 

 (1) Owns and has the power to vote more than 50 percent of the outstanding voting equity securities [§ 1.40] of a corporation; or
 

 (2)
 
 Otherwise exercises a controlling influence over the management or policies of the corporation or the transaction or conduct in question by virtue of the person's position as a shareholder
 
 .
 

 (b) A person who, either alone or pursuant to an arrangement or understanding with one or more other persons, owns or has the power to vote more than 25 percent of the outstanding voting equity securities of a corporation is presumed to exercise a controlling influence over the management or policies of the corporation, unless some other person, either alone or pursuant to an arrangement or understanding with one or more other persons, owns or has the power to vote a greater percentage of the voting equity securities. A person who does not, either alone or pursuant to an arrangement with one or more other persons, own or have the power to vote more than 25 percent of the outstanding voting equity securities of a corporation is not presumed to be in control of the corporation by virtue solely of ownership of or power to vote voting equity securities.
 

 American Law Institute,
 
 Principles of Corporate Governance
 
 § 1.10 (1994) (emphasis added). We note that the American Law Institute applies the presumption of control at a lower threshold,
 
 i.e.
 
 , when a shareholder owns twenty-five percent of the corporation.
 

 Id.
 

 This is in contrast to our precedents and the decisions by Delaware courts in which control is presumed only where the shareholder holds a numerical majority interest.
 

 Defendants argue that
 
 Gaines
 
 and our other precedents support the bright line rule that a "controlling shareholder" must have a numerical majority of the outstanding shares. However, these decisions hold only that a majority shareholder is presumed to be a "controlling shareholder."
 
 See
 

 Gaines
 
 ,
 
 234 N.C. at 344-45
 
 ,
 
 67 S.E.2d at
 
 353-54 ;
 
 Kaplan
 
 ,
 
 196 N.C.App. at 473-74
 
 ,
 
 675 S.E.2d at 137
 
 . We find persuasive
 
 *56
 
 Delaware's rule that a minority shareholder exercising actual control over a corporation or a corporation's affairs may be classified as a "controlling shareholder."
 

 At the pleading stage, we must accept as true all of Plaintiff's allegations without regard to whether Plaintiff can produce evidence to support those allegations. But we begin with the general presumption that a minority shareholder is not in control of a corporation's conduct.
 
 Citron
 
 ,
 
 569 A.2d at
 
 70 ;
 
 see
 

 Kaplan
 
 ,
 
 196 N.C.App. at 473-74
 
 ,
 
 675 S.E.2d at
 
 137 ;
 
 Freese
 
 ,
 
 110 N.C.App. at 37-38
 
 ,
 
 428 S.E.2d at 847-48
 
 . This presumption may be rebutted if a plaintiff alleges facts from which it is reasonable to infer that a minority shareholder exercised actual control over the corporation's actions.
 
 Kahn
 
 ,
 
 638 A.2d at
 
 1113-14 ;
 
 see
 

 Gaines
 
 ,
 
 234 N.C. at 344-45
 
 ,
 
 67 S.E.2d at
 
 353-54 ;
 
 White
 
 ,
 
 149 N.C. at 420
 
 ,
 
 63 S.E. at 111
 
 .
 

 When tested by a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint for a claim based upon shareholder liability must allege specific facts demonstrating or allowing for the reasonable inference of actual control by that shareholder. "The bare conclusory allegation that a minority stockholder possessed control is insufficient. Rather, the Complaint must contain well-pled facts allowing for a reasonable inference that the minority stockholder 'exercised actual domination and control over ... [the] directors.' "
 
 In re Morton's Restaurant Grp., Inc.
 
 ,
 
 74 A.3d 656
 
 , 664-65 (Del. Ch. 2013) (alterations in original) (citations omitted).
 

 Plaintiff argues that the Amended Complaint is not subject to dismissal because it alleges a "nexus of facts" that allows for a reasonable inference of corporate control by British American. Plaintiff relies on
 
 *333
 

 Williams v. Cox Commc'ns, Inc.
 
 , 2006 Del. Ch. LEXIS 111 *1, *22 (Del. Ch. June 5, 2006), an unpublished decision by the Chancery Court of Delaware, to support the "nexus of facts" standard. The court in
 
 Williams
 
 noted that with respect to claims alleging wrongful control by corporate shareholders, the line between whether certain actions amount to influence or control "is highly contextualized and is difficult to resolve based solely on the complaints[,]" and that while "[n]o single allegation in [the] plaintiff's complaint is sufficient on its own ... [t]he complaint succeeds because it pleads a nexus of facts all suggesting that the [defendants] were in a controlling position and that they exploited that control for their own benefit."
 
 Id.
 
 at *23-24. This Court and the North Carolina Supreme Court routinely dismiss the precedential value of unpublished decisions. But absent any North Carolina precedent on the issue, we find the analysis in
 
 Williams
 
 helpful. We likewise agree
 
 *57
 
 that a complaint alleging minority shareholder liability should survive a 12(b)(6) motion to dismiss if it pleads a "nexus of facts" allowing for a reasonable inference that the minority shareholder exercised actual control over material corporate affairs.
 

 2. Sufficiency of the Pleadings
 

 After careful review of the Amended Complaint and all inferences that may be drawn from its allegations, we hold that Plaintiff has pleaded facts sufficient to allow for a reasonable inference that British American exercised actual control over the Transaction and thus owed a fiduciary duty to Plaintiff.
 

 To plead most civil claims in North Carolina, a complaint must contain "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]" N.C. Gen. Stat. § 1A-1, Rule 8(a)(1) (2015). "Thus, a complaint is sufficient where no insurmountable bar to recovery appears on the face of the complaint and the complaint's allegations give adequate notice of the nature and extent of the claim."
 
 Pastva v. Naegele Outdoor Advers., Inc.
 
 ,
 
 121 N.C.App. 656
 
 , 659,
 
 468 S.E.2d 491
 
 , 493 (1996) (internal quotation marks and citations omitted).
 

 The purpose behind this pleading standard, generally referred to as notice pleading, "is to resolve controversies on the merits, after an opportunity for discovery, instead of resolving them based on the technicalities of pleadings."
 
 Ellison v. Ramos
 
 ,
 
 130 N.C.App. 389
 
 , 395,
 
 502 S.E.2d 891
 
 , 895 (1998) (citation omitted). Therefore, "[p]leadings must be liberally construed to do substantial justice, and must be fatally defective before they may be rejected as insufficient."
 
 Fournier v. Haywood Cnty. Hosp.
 
 ,
 
 95 N.C.App. 652
 
 , 654,
 
 383 S.E.2d 227
 
 , 228-29 (1989) (citing
 
 Smith v. N.C. Farm Bureau Mut. Ins. Co.
 
 ,
 
 84 N.C.App. 120
 
 , 123,
 
 351 S.E.2d 774
 
 , 776 (1987) ).
 

 The North Carolina legislature has designated several matters in which heightened pleading requirements must be met. N.C. Gen. Stat. § 1A-1, Rule 9 (2015). These matters include, among others, claims asserting capacity, fraud, duress, mistake, and libel and slander.
 

 Id.
 

 For these delineated situations, the legislature sought to provide guidance in areas "which have traditionally caused trouble when no codified directive existed." N.C. Gen. Stat. § 1A-1, Rule 9 N.C. cmt. (2015). Absent a specific designation by statute or precedent, we see no reason to adopt a stricter pleading standard for suits against minority shareholders for a
 
 *58
 
 breach of a fiduciary duty. North Carolina's pleading standard requires a plaintiff to plead facts sufficient to overcome the presumption that a minority shareholder is not in control of a corporation's conduct. A complaint against a minority shareholder must therefore allege facts from which a trier of fact could reasonably infer that the minority shareholder exercised actual control over the corporation.
 

 To survive a 12(b)(6) motion to dismiss, a complaint for breach of fiduciary duty claim must allege, in addition to the existence of a fiduciary relationship, a breach of that duty.
 
 Toomer v. Branch Banking & Trust Co.
 
 ,
 
 171 N.C.App. 58
 
 , 70,
 
 614 S.E.2d 328
 
 , 337 (2005) (internal quotation marks and citations omitted) ("To state a claim for breach of fiduciary duty, a plaintiff must allege that a
 
 *334
 
 fiduciary relationship existed and that the fiduciary failed to act in good faith and with due regard to [the] [plaintiff's] interests.") (second alteration in original).
 

 a. Limitations Preventing British American from Controlling Reynolds
 

 Defendants argue that Plaintiff's Amended Complaint disclosed facts that necessarily defeated his claim-the limitations on British American's control of Reynolds contained within the Governance Agreement. The Governance Agreement provides,
 
 inter alia
 
 :
 

 • British American has the right to designate only five of the thirteen directors on the Reynolds Board of Directors, with the number of directors designated by British American decreasing incrementally if British American's ownership drops below certain thresholds. Additionally, three of the directors designated by British American must be independent as defined by the rules of the New York Stock Exchange.
 

 • With respect to the eight directors which it cannot designate, British American must vote all of its shares in favor of any Board of Director candidates selected by a committee comprised solely of directors not designated by British American.
 

 • A majority of the directors not designated by British American must approve Reynolds's entrance into any contract involving Reynolds and its subsidiaries and British American and its subsidiaries.
 

 • The Standstill provision prevented British American from purchasing additional shares in Reynolds until 30 July 2014.
 

 *59
 

 b. Circumstances Allowing British American to Control Reynolds
 

 Plaintiff asserts that events and circumstances surrounding the Transaction, including those described in the Proxy Statement, allowed British American to exercise actual control over the Transaction notwithstanding the terms of the Governance Agreement. Plaintiff cites the following allegations to support this assertion: (1) British American's outsized shareholding constituted a
 
 de facto
 
 veto power over any matter put to a shareholder vote-British American owned a forty-two percent stake of the voting shares, while the next largest block was five percent; (2) the Governance Agreement's granting to British American "veto power," in the form of contractual rights to prohibit the issuance of shares and the divestment of intellectual property necessary for the Transaction; (3) deal terms allowing British American to profit at the expense of-and to the exclusion of-the non-British American shareholders; and (4) the failure by the Other Directors to counter British American's control over the Transaction.
 

 Our review has identified the following specific facts alleged or contained in the Governance Agreement or Proxy Statement from which a reasonable trier of fact could infer that British American exercised actual control over Reynolds with respect to the Transaction:
 

 • In late 2012, the Reynolds Board of Directors considered a merger with Lorillard. Representatives of British American "expressed their support, on behalf of BAT as an RAI shareholder, for approaching Lorillard with an indication of interest."
 

 • With the support of British American, Reynolds approached Lorillard and discussions between the two corporations ensued.
 

 • In January 2013, British American's representatives reiterated, in discussions with the Reynolds Board of Directors, British American's support for the Transaction conditioned upon deal terms including British American maintaining its forty-two percent ownership of the surviving company following the merger.
 

 BAT's representatives also stated that decisions as to whether and how to pursue a business combination between RAI and Lorillard were to be made by the RAI board of directors, but that BAT, in its capacity as a substantial financing source and holder of contractual approval
 
 *335
 
 rights, would cooperate with combining the
 
 *60
 
 companies only on transactional terms and with an execution strategy of which it approved.
 

 • Negotiations between Reynolds, Lorillard, and British American continued throughout the following months. Included among the negotiated terms was, "at the insistence of BAT, that neither BAT nor RAI would seek any changes in the governance agreement in connection with the possible acquisition of Lorillard."
 

 • On 18 January 2014, the Reynolds Board of Directors met with, among others, representatives of Lazard, Reynold's financial advisors. "A representative of Lazard ... introduce[ed] an alternative approach [to the Transaction] in which cash available as consideration would be distributed on a pro rata basis to Lorillard shareholders and to RAI shareholders other than BAT." The Lazard representatives also reported on discussions between
 

 [Reynolds] management and Lazard, on the one hand, and BAT and its financial advisors, on the other, during which the parties discussed potential solutions that would be in the best interests of RAI shareholders other than BAT and continue to meet the objectives of both Lorillard and BAT. These discussions included the possibility that BAT and/or RAI shareholders other than BAT could have decreased post-closing ownership interest in the combined company.
 

 Following this meeting, the Other Directors discussed with Reynolds's outside legal advisors their fiduciary duties.
 

 • The Other Directors reached a consensus "that RAI shareholders other than BAT should receive at least 30% of the equity ownership of the combined company and receive a pro rata portion of the cash distribution." The Other Directors also discussed the need to engage independent legal counsel.
 

 • During a meeting on 12 February 2014 between the Other Directors and legal and financial advisers for Reynolds as well as independent counsel for the Other Directors, "[t]here was extensive discussion regarding the consideration to be received by RAI shareholders other than BAT and BAT's willingness to move from its initial position regarding post-transaction equity ownership."
 

 • On 18 February 2014, the Reynolds Board of Directors discussed a counter-proposal by Lorillard seeking a higher percentage of post-transaction ownership. "The Other Directors considered the impact of increased ownership for Lorillard shareholders on RAI
 

 *61
 
 shareholders other than BAT[,]" and "expressed their preference that any additional equity to Lorillard shareholders come from decreased ownership by BAT."
 

 • By 20 February 2014, British American indicated, consistent with its earlier position that it "was not prepared to extend the standstill covenant in the governance agreement in connection with the proposed business combination transaction...."
 

 • On 13 March 2014, the Lorillard Board of Directors, fearing the Transaction was not a "merger-of-equals," determined not to proceed and terminated discussions.
 

 • Reynolds's senior management then considered acquiring Lorillard at a premium-
 
 i.e.
 
 , purchasing Lorillard-as opposed to the previous "merger-of-equals" approach. Reynolds's Board of Directors began discussions with Lazard and Lorillard concerning this newly structured approach to the Transaction. This Transaction was to be funded by equity financing from British American, by which British American would purchase Reynolds shares and maintain its forty-two percent interest in the remaining company following the acquisition.
 

 • On 17 June 2014, Jones Day-legal counsel for Reynolds-received a draft subscription and support agreement from British American proposing the terms of equity financing for the new Transaction. In the subscription and
 
 *336
 
 support agreement, British American pledged to vote its shares in favor of the Transaction, regardless of whether the Reynolds Board of Directors recommended proceeding with the Transaction.
 

 • On 2 July 2014, Moore & Van Allen-independent legal counsel for the Other Directors-reviewed the proposed subscription and support agreement. Moore & Van Allen "requested that BAT's draft provision for an unconditional commitment to vote the shares of RAI common stock it beneficially owned in favor of the transaction (regardless of any change in recommendation of the RAI board of directors) be deleted."
 

 • On 5 July 2014, Representatives of Lorillard notified Jones Day
 

 that Lorillard was insistent, as a condition of proceeding, on having a commitment from BAT to vote the shares of RAI common stock it beneficially owned in favor of the transaction even if the RAI board of directors changed its recommendation of the transaction. [BAT's legal counsel]
 

 *62
 
 advised Jones Day that BAT would consider this demand but would not give such a commitment over the objections of the Other Directors. The Other Directors agreed to accept that commitment.
 

 The Proxy Statement does not provide any explanation regarding how or why the Other Directors determined to depart from the advice of their independent legal counsel in this respect.
 

 • On 9 July 2014, "several news media speculated that BAT was seeking to acquire the remaining outstanding shares of RAI common stock that it did not currently own."
 

 • On 14 July 2014, the Reynolds Board of Directors unanimously approved the Transaction.
 

 The information summarized above is but a drop in the bucket of the detailed financial and historical data included within the Proxy Statement and endemic to corporate mergers and acquisitions. A multitude of inferences can be drawn from this information. However, our task is to consider whether the facts alleged allow for any reasonable inference that can support Plaintiff's claim.
 

 When reviewing a 12(b)(6) motion, "the complaint must be liberally construed and should not be dismissed for insufficiency unless it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim."
 
 Zenobile v. McKecuen
 
 ,
 
 144 N.C.App. 104
 
 , 110,
 
 548 S.E.2d 756
 
 , 760 (2001). Plaintiff's Amended Complaint alleged facts that support the reasonable inference that British American exercised actual control over Reynolds's Board of Directors' approval of the Transaction, despite the restrictions of the Governance Agreement.
 

 This is a close case, even under the liberal standard of notice pleading. We acknowledge that one reasonable inference to be drawn from the events and circumstances is that the Other Directors believed that the Transaction was valuable enough to all shareholders that it was worth proceeding even on terms that disproportionately enriched British American. Another reasonable inference could be that the Other Directors did not seek funding for the Transaction from any other source because they had investigated prospects and determined that funding on the same or better terms was not available elsewhere. It is also reasonable to infer that British American earned the increased value of the shares it purchased by incurring the financial risk inherent in the Transaction, a risk not incurred by other shareholders. However, these
 
 *63
 
 possible inferences do not preclude other reasonable inferences that support Plaintiff's claim that British American was a controlling shareholder with an accompanying fiduciary duty.
 

 Defendants note that the strategic advantages British American enjoyed, such as its role as equity financer of the Transaction, have been dismissed by our courts as insufficient to establish a fiduciary duty.
 
 Kaplan
 
 ,
 
 196 N.C.App. at 474-77
 
 ,
 
 675 S.E.2d at 137-39
 
 (holding that the plaintiff did not allege sufficient control of a limited liability company by a forty-one percent owner who was the company's sole source of financing). Defendants
 
 *337
 
 also argue that British American's contractual rights to prohibit the issuance of shares and transfer of intellectual property necessary to complete the Transaction do not constitute control.
 
 See
 

 Superior Vision Servs. v. ReliaStar Life Ins. Co.
 
 ,
 
 2006 WL 2521426
 
 *5, 2006 Del. Ch. LEXIS 160 *1, *19-20 (Del. Ch. Aug. 25, 2006) (holding the defendant's exercise of its contractual right to prevent the distribution of dividends did not render it a "controlling shareholder" with an accompanying fiduciary duty). But unlike the facts alleged in any of the cases relied upon by Defendants, Plaintiff's Amended Complaint alleged a combination of facts which in the aggregate support a reasonable inference of actual control.
 

 Defendants urge us to follow the Delaware Chancery Court's decision in
 
 Thermopylae Capital Partners, L.P. v. Simbol, Inc.
 
 ,
 
 2016 WL 368170
 
 *1, 2016 Del. Ch. LEXIS 15 *1 (Del. Ch. Jan. 29, 2016), which distinguished potential control from actual control and held that potential control is insufficient to impose a fiduciary duty. In
 
 Thermopylae
 
 , the plaintiff's complaint failed to allege "the number of directors at the time of the transaction, their identity, facts showing control by [the defendant], and details regarding the terms of the transaction itself[.]"
 
 Id.
 
 at *13, 2016 Del. Ch. LEXIS 15 at *44-45. In contrast, Plaintiff's Amended Complaint alleges detailed facts, which we hold allow for the reasonable inference that British American exercised actual control over the Transaction.
 

 Defendants also contrast the circumstantial allegations in this case with more explicit facts shown in cases upholding controlling shareholder liability. For example, Plaintiff has not alleged that any director designated by British American told other directors, "[y]ou have to do what we tell you."
 
 Cf.
 

 Kahn
 
 ,
 
 638 A.2d at 1114
 
 . However, the lack of more explicit facts at the pleading stage, before a plaintiff can obtain discovery, is not fatal if less than explicit facts allow for a reasonable inference of the essential elements of the claim.
 

 Here, Plaintiff's allegations allow for a reasonable inference that the Other Directors agreed to the terms of the Transaction dictated by
 
 *64
 
 British American at the expense of other shareholders in order to avoid the risk of a corporate takeover by British American. The Amended Complaint alleged not only that British American conditioned its support for the Transaction on terms disfavoring the other shareholders, but that the Other Directors capitulated to British American's terms against the advice of their independent legal counsel. The aggregate of these allegations along with the size of British American's shareholding, British American's contractual rights under the Governance Agreement, the impending expiration of the Standstill provision, and the lack of explanation surrounding the Other Director's decision to abandon advice by their independent legal counsel allows for the reasonable inference of actual control.
 

 We conclude these allegations comprise a sufficient nexus of facts from which it is reasonable to infer that British American exercised actual control over the Transaction and the actions taken by the Other Directors. Therefore, Plaintiff has sufficiently pleaded that British American is a controlling shareholder with a concomitant fiduciary duty owed to Plaintiff, as a non-British American minority shareholder.
 

 Having established that the Amended Complaint alleged facts sufficient to support the reasonable inference that British American owed a fiduciary duty to Plaintiff, we next consider whether the Amended Complaint includes allegations sufficient to establish, for the purposes of withstanding a 12(b)(6) challenge, that British American breached this duty and did not act in good faith with regard to Plaintiff's interests. We hold it does.
 

 The relevant facts alleged include: conflicts of interests between British American and the non-British American shareholders noted by Reynolds's Board of Directors, the Other Directors' failure to obtain outside financial advice to resolve the conflicts, British American's potential pressuring of the Other Directors to act contrary to the interests of the non-British American shareholders, and British American's purchase of Reynolds stock below the fair market value on the closing date of the Transaction. These facts
 
 *338
 
 allow for a reasonable inference that British American breached its fiduciary duty to the other shareholders by acting contrary to their interest for its own pecuniary gain.
 

 We conclude that Plaintiff alleged a nexus of facts that permits the reasonable inference that British American controlled the conduct of Reynolds for its pecuniary benefit to the detriment of the other shareholders. We do not hold that Plaintiff has presented evidence sufficient to prove that British American was a controlling shareholder, to prove
 
 *65
 
 that British American breached a fiduciary duty, or even sufficient to raise disputed issues of fact in this regard. We simply hold the Amended Complaint alleges facts sufficient, if proven true, to allow for the reasonable inference that British American exercised actual control over the Transaction and breached its fiduciary duty to the other shareholders. Whether Plaintiff is able to produce evidence necessary to support his claims is a question to be answered after discovery.
 

 Accordingly, we reverse the trial court's dismissal of Plaintiff's claim against British American pursuant to Rule 12(b)(6).
 

 3. Standing
 

 The general rule in North Carolina is that a shareholder may not bring suit against third parties except in a derivative action on behalf of the corporation.
 
 Barger v. McCoy Hillard & Parks
 
 ,
 
 346 N.C. 650
 
 , 658,
 
 488 S.E.2d 215
 
 , 219 (1997). There are two exceptions to this rule: when a plaintiff can show either (1) the defendant owed the plaintiff a special duty, or (2) the plaintiff suffered an injury separate and distinct from other shareholders.
 
 Barger
 
 ,
 
 346 N.C. at 658-59
 
 ,
 
 488 S.E.2d at 219-20
 
 . A fiduciary duty may constitute a "special duty" when owed directly to a party.
 
 See
 

 id.
 
 at 658-59,
 
 488 S.E.2d at 220
 
 .
 

 Here, Plaintiff's standing to bring a direct claim against British American turns on whether Plaintiff's Amended Complaint has alleged a special duty and thus a claim for relief. Because the Amended Complaint included allegations sufficient to support the conclusion that British American owed a fiduciary duty, Plaintiff has standing to bring a direct claim against British American.
 

 C. Claims against Boards of Directors
 

 Plaintiff next contends the trial court erred by dismissing his claim against Defendant-Directors for breach of fiduciary duty. The trial court did not determine whether Plaintiff had standing to sue Defendant-Directors, but instead dismissed Plaintiff's claims on the merits. We hold that Plaintiff does not have standing and therefore affirm the trial court's dismissal on this alternative ground.
 

 "The well-established general rule is that shareholders cannot purse individual causes of action against third parties for wrongs or injuries to the corporation that result in the diminution or destruction of the value of their stock."
 
 Barger
 
 ,
 
 346 N.C. at 658
 
 ,
 
 488 S.E.2d at 219
 
 (citations omitted). Such third parties include the directors of a corporation.
 
 See
 

 Green v. Freeman
 
 ,
 
 367 N.C. 136
 
 , 141,
 
 749 S.E.2d 262
 
 , 268 (2013). "The General Assembly has expressly indicated its intent 'to avoid an interpretation
 
 *66
 
 [of
 
 N.C. Gen. Stat. § 55-8-30
 
 ] ... that would give shareholders a direct right of action on claims that should be asserted derivatively' and to avoid giving creditors a generalized fiduciary claim."
 

 Id.
 

 (quoting
 
 N.C. Gen. Stat. § 55-8-30
 
 N.C. cmt. (2011)). Two exceptions to this rule allow shareholders to bring direct actions against either a third party or the directors: (1) "if the shareholder can show that the wrongdoer owed him a special duty or [ (2) ] that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself."
 
 Barger
 
 ,
 
 346 N.C. at 658-59
 
 ,
 
 488 S.E.2d at 219
 
 (citations omitted).
 

 To establish the first exception, a plaintiff "must allege facts from which it may be inferred that defendants owed plaintiffs a special duty. The special duty may arise from contract or otherwise."
 
 Id.
 
 at 659,
 
 488 S.E.2d at 220
 
 (citation omitted). The North Carolina Supreme Court has recognized as illustrative of a special duty, "when a party violate[s] its fiduciary duty to the shareholder."
 

 Id.
 

 (citing
 
 FTD Corp. v. Banker's Trust Co.
 
 ,
 
 954 F.Supp. 106
 
 , 109 (S.D.N.Y. 1997) ). However, North Carolina has established that a director's fiduciary duty is owed to the corporation
 
 *339
 
 itself and not to the shareholders individually.
 
 Estate of Browne v. Thompson
 
 ,
 
 219 N.C.App. 637
 
 , 640-41,
 
 727 S.E.2d 573
 
 , 576 (2012). Because the legislature intended shareholders to bring derivative actions, as opposed to direct actions, and a directors' fiduciary duty is to the corporation generally and not the shareholder individually, a shareholder's action against a director should be brought derivatively unless he or she can allege facts that the director owed him or her a special duty beyond that of the general fiduciary duty to the corporation.
 
 Barger
 
 ,
 
 346 N.C. at 660
 
 ,
 
 488 S.E.2d at 220
 
 ("Plaintiffs have alleged no facts from which it may be inferred that defendants owed plaintiffs in their capacities as shareholders a duty that was personal to them and distinct from the duty defendants owed the corporation.").
 

 Under the second exception, a plaintiff must "present evidence that they suffered an injury peculiar or personal to themselves."
 
 Green
 
 ,
 
 367 N.C. at 144
 
 ,
 
 749 S.E.2d at
 
 269 (citing
 
 Barger
 
 ,
 
 346 N.C. at 661
 
 ,
 
 488 S.E.2d at
 
 221 ). "An injury is peculiar or personal to the shareholder if 'a legal basis exists to support plaintiffs' allegations of an individual loss, separate and distinct from any damage suffered by the corporation.' "
 
 Barger
 
 ,
 
 346 N.C. at 659
 
 ,
 
 488 S.E.2d at 220
 
 (quoting
 
 Howell v. Fisher
 
 ,
 
 49 N.C.App. 488
 
 , 492,
 
 272 S.E.2d 19
 
 , 23 (1980) ). The general diminution of stock value is not considered an injury "peculiar or personal" as it is felt by the corporation itself.
 
 Green
 
 ,
 
 367 N.C. at 144
 
 ,
 
 749 S.E.2d at 269
 
 ("The loss of an investment is identical to the injury suffered by the corporate entity as a whole.") (internal quotations and citations omitted).
 

 *67
 
 Here, Plaintiff asserts standing to bring his claim against Defendant-Directors under the second exception. Plaintiff frames his injuries as the inadequate compensation for the stock sold to British American and the dilution of voting power that resulted from this sale of shares to British American. Plaintiff argues these injuries were suffered uniquely by Plaintiff and the other non-British American shareholders, and thus satisfies the "peculiar or personal" requirement. We disagree.
 

 Plaintiff's claimed injury from the inadequate compensation is the exact loss contemplated by the legislature when it drafted the requirement that plaintiffs must assert derivative claims where the injury is felt by the corporation itself. This injury does not satisfy the "peculiar or personal" requirement, and therefore standing for Plaintiff's direct claim may not be based on this injury.
 

 Plaintiff's alternative framing for the injury,
 
 i.e.
 
 , the dilution of voting power, requires further consideration, but ultimately is not sufficient to satisfy the "peculiar or personal" requirement. Recognizing such dilution as a basis for standing to sue directly could allow any minority shareholder who opposes an equity financing agreement to bring a direct suit against the corporation's directors. Such injury is at its core a diminution of value of the stock held. While it is less directly felt by the corporation itself, it is felt generally by the shareholders and is thus not peculiar or personal to any one shareholder. Therefore, we hold that a dilution of voting power, standing alone, is an insufficient injury to base standing for a shareholder's direct claim against a board of directors.
 

 Because we hold that Plaintiff has failed to allege facts necessary to establish either exception to the general rule requiring actions against the directors to be brought derivatively, we affirm the trial court's dismissal of Plaintiff's claim.
 

 D. Claims against Corporation
 

 Plaintiff's final issue on appeal challenges the trial court's dismissal of his claim against Reynolds for aiding and abetting a breach of fiduciary duty.
 

 The validity of an aiding and abetting a breach of fiduciary duty claim brought against a corporation for the actions of its directors is unsettled in North Carolina.
 
 Bottom v. Bailey
 
 ,
 
 238 N.C.App. 202
 
 , 211-12,
 
 767 S.E.2d 883
 
 , 889 (2014). However, we need not address this issue today, because Plaintiff lacks standing to bring the underlying breach of fiduciary duty claim as against Defendant-Directors.
 
 See, e.g.,
 

 Id.
 
 at 211,
 
 767 S.E.2d at 889
 
 . Accordingly, we hold the trial court did not err in
 
 *68
 
 dismissing Plaintiff's
 
 *340
 
 claim of aiding and abetting a breach of fiduciary duty with respect to Reynolds.
 

 Conclusion
 

 Plaintiff's Amended Complaint, taken as true, supports the conclusion that British American acted as a "controlling shareholder," and therefore owed Plaintiff, as a minority shareholder, a fiduciary duty. The Amended Complaint, however, failed to establish that Defendant-Directors owed Plaintiff a special duty or that Plaintiff's injury was separate and distinct, and therefore Plaintiff failed to establish standing to bring a direct claim against Defendant-Directors. Because the complaint failed to plead the underlying fiduciary duty against Defendant-Directors, Plaintiff's claim against Reynolds for aiding and abetting a breach of fiduciary duty must also fail. Accordingly, the trial court erred in dismissing Plaintiff's claim against British American but did not err in dismissing Plaintiff's claims against Defendant-Directors and Reynolds. Therefore, we reverse and remand the trial court's order dismissing Plaintiff's claim against British American and affirm the trial court's order dismissing Plaintiff's claims against the Director Defendants and Reynolds.
 

 REVERSED AND REMANDED IN PART AND AFFIRMED IN PART.
 

 Judges ELMORE and MCCULLOUGH concur.
 

 [1]
 

 Neither party challenges the application of North Carolina law.
 

 [2]
 

 Before it was incorporated in
 
 Gaines
 
 , the holding in
 
 White
 
 was
 
 dicta
 
 , because the court in
 
 White
 
 , reviewing an order restraining the dissolution of the defendant corporation, concluded that the plaintiff had failed to produce evidence sufficient to support his claim.
 
 White
 
 ,
 
 149 N.C. at 422-23
 
 ,
 
 63 S.E. at 111
 
 .