MARTIN, Chief Justice.
*731 **606 This appeal arises from the agreement of Reynolds American, Inc. to purchase Lorillard, Inc. Defendant British American Tobacco PLC (BAT) owned 42% of the stock in Reynolds and agreed to fund part of the Lorillard transaction by purchasing enough of the newly acquired shares to maintain that 42% ownership interest. The terms of this agreement diluted the voting power of Reynolds' other minority shareholders, including plaintiff Dr. Robert Corwin. Plaintiff then filed a putative class action suit on behalf of similarly situated stockholders asserting a claim for breach of fiduciary duty against, among others, BAT.
In this appeal, we consider whether BAT owed fiduciary duties to those other shareholders in the context of the Lorillard acquisition. The Business Court concluded that BAT did not owe fiduciary duties to the other shareholders and granted BAT's motion to dismiss. We agree with the Business Court and therefore reverse the decision of the Court of Appeals.
I. Background
The matter before us is an appeal of a determination under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, so we accept all **607 of the facts pleaded in plaintiff's First Amended Class Action Complaint (the operative pleading here, which we will hereinafter refer to as the Complaint) as true. See Arnesen v. Rivers Edge Golf Club & Plantation, Inc. , 368 N.C. 440, 448, 781 S.E.2d 1, 7 (2015) (quoting Sutton v. Duke , 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970) ). Our statement of the facts of this case is derived from the Complaint, as well as from other documents that the Complaint incorporates by reference.
Reynolds, an American tobacco company, was created after Reynolds' predecessor entity acquired Brown & Williamson (B&W), another tobacco company. B&W was a subsidiary of BAT, a tobacco holding company that is headquartered in London. As a result of the transaction, BAT became a 42% stockholder of Reynolds, and BAT and Reynolds entered into a governance agreement dated 30 July 2004 (the Governance Agreement).
The Governance Agreement contained specific limitations on BAT's power.[1] BAT could effectively nominate only five members to Reynolds' thirteen-member Board of Directors, and three of those nominees had to be "Independent Directors." The Governance Agreement defined the term "Independent Director" to mean a director who was considered independent of Reynolds under the New York Stock Exchange Rules[2] and who had not been a director, officer, or employee of BAT or its subsidiaries within the past three years. Reynolds' Corporate Governance and Nominating Committee (the Committee) had the right to nominate the remaining eight *732 directors, seven of whom had to be Independent Directors. All members of the Committee itself had to be Independent Directors, and, provided that the Reynolds board was fully staffed, the majority of those directors had to be non-BAT-nominated Independent Directors. During a standstill period imposed by the Governance Agreement,[3] BAT could not seek removal of any of the directors that it did not nominate, unless the **608 Reynolds board amended or waived that limitation. Further, a majority of the Independent Directors who were not nominated by BAT had to approve any material transaction between, or involving, Reynolds and BAT (with certain narrow exceptions that no party asserts as being relevant here). These restrictions, along with the rest of the Governance Agreement, would continue until BAT's ownership interest reached 100% or fell below 15% (or until a person or group other than BAT, with some other exceptions not relevant here, owned or controlled more than 50% of the voting power of all voting stock), at which point the Governance Agreement would terminate by its own terms.
Alongside these restrictions, the Governance Agreement conveyed certain contractual rights to BAT. The Governance Agreement required the approval of a majority of the BAT-nominated directors for certain actions such as stock issuances if that stock would have voting power greater than or equal to 5% of the voting power outstanding before that issuance. It also required the approval of BAT as a stockholder for certain actions such as the sale of specified intellectual property.
In September 2012, Reynolds, the second-largest tobacco company in the United States, began considering a merger with Lorillard, the third-largest tobacco company in the United States. Reynolds met with BAT before entering negotiations with Lorillard. BAT indicated that it would support the Lorillard merger only on terms that it approved of and expressed its desire to maintain its 42% ownership interest in Reynolds. BAT was willing to provide financing for the transaction through purchasing enough of the newly acquired shares to maintain its ownership interest, and the parties agreed to a term sheet regarding that financing. BAT insisted that this term sheet contain a provision that prevented BAT or Reynolds from seeking to change the Governance Agreement in connection with the proposed transaction. BAT also indicated that it was not willing to extend the standstill period specified in the Governance Agreement.
Initially, discussions proceeded toward what Lorillard hoped would be a merger of equals. The Other Directors-a term that the Governance Agreement defined (in its singular form) to mean an Independent Director of the Reynolds board who was not nominated by BAT-even discussed reducing BAT's ownership percentage after the merger to allow a greater **609 ownership level for Lorillard's stockholders. But this change ultimately did not happen. Eventually, Lorillard terminated negotiations after concluding that the transaction was not truly a merger of equals given the power that BAT would wield over the combined company. Reynolds then decided to pursue an acquisition of Lorillard instead.
During subsequent negotiations, the Other Directors requested the removal of a provision in the proposed merger agreement that required BAT to vote its shares of Reynolds stock in favor of the transaction regardless of whether the Reynolds board changed its recommendation in favor of the transaction. Lorillard, however, insisted that this provision remain in the agreement. BAT said that it would consider Lorillard's demand but would not commit over the objections of the Other Directors. The Other Directors agreed to allow the provision to remain in the proposed merger agreement, so it did, in fact, remain there.
*733 On 15 July 2014, the companies announced that they had reached a final agreement. Reynolds would purchase Lorillard and pay the Lorillard stockholders a combination of 0.2909 shares of Reynolds common stock plus $50.50 for each share of Lorillard stock that they owned. At the time, this price corresponded to a value of $68.88 per Lorillard share based on the closing price of Reynolds stock on 14 July 2014.
To help finance the acquisition, Reynolds would divest a package of assets, including several cigarette brands, to Imperial Tobacco Group PLC. Additionally, BAT would help finance the acquisition by purchasing enough additional shares of Reynolds for it to maintain its 42% ownership of Reynolds after the completion of the transaction. BAT would be permitted to purchase these additional Reynolds shares for $60.16 per share-the price of Reynolds stock on 2 July 2014, which was also used to determine the stock component of the Lorillard shareholders' consideration. This price was $3.02 less than the closing price of Reynolds stock on 14 July 2014, the day before the transaction was executed. Reynolds and BAT also agreed to pursue a technology-sharing initiative for next-generation tobacco products such as digital vapor cigarettes. The entire Reynolds board, including the Other Directors, unanimously approved these transactions.[4]
In response to the announcement of these transactions, plaintiff Dr. Robert Corwin filed a class action complaint against BAT, Reynolds, and **610 a group of Reynolds' directors (director defendants) in his capacity as trustee for the Beatrice Corwin Living Irrevocable Trust and on behalf of other stockholders similarly situated. The case was designated as a mandatory complex business case to be heard by the Business Court. The Complaint (which, again, is the operative pleading here) alleges, among other things, that BAT was a controlling stockholder of Reynolds, that BAT therefore owed fiduciary duties to plaintiff, and that BAT breached those fiduciary duties through its conduct in connection with the Lorillard transaction. Although BAT was not a majority stockholder of Reynolds, plaintiff bases his claim that BAT was nevertheless a controlling stockholder on various aspects of the Reynolds-BAT Governance Agreement and BAT's involvement in the Lorillard transaction. Plaintiff claims that BAT's control over Reynolds allowed BAT to negotiate benefits for itself that were not shared with other Reynolds stockholders.
BAT, Reynolds, and director defendants moved to dismiss plaintiff's Complaint. BAT argued that it was not a controlling stockholder of Reynolds and did not owe fiduciary duties to plaintiff under North Carolina law because it owned less than a majority of Reynolds stock. BAT also argued that plaintiff's claim was derivative and that plaintiff therefore lacked standing because he had not made a pre-suit demand on the Reynolds board, as North Carolina law requires before a plaintiff files a derivative suit. Plaintiff, on the other hand, urged the Business Court to adopt the standard that Delaware uses to determine whether a stockholder is a controlling stockholder, which would impose fiduciary duties on a minority stockholder who is found to be controlling.
The Business Court granted all of the defendants' motions to dismiss. Regarding BAT, the Business Court concluded that, even if the Delaware standard applied, the Complaint failed to allege that BAT exercised actual control over the Reynolds board regarding the transaction. In reaching this conclusion, the Business Court noted the "extraordinary" limitations that the Governance Agreement placed on BAT's ability to control the Reynolds board. Plaintiff appealed the dismissal of his claims to the Court of Appeals.
In a unanimous opinion, the Court of Appeals reversed the Business Court's dismissal of plaintiff's claims against BAT but affirmed the dismissal of plaintiff's claims against Reynolds and director defendants. Corwin v. British Am. Tobacco PLC , --- N.C. App. ----, ----, 796 S.E.2d 324, 340 (2016). The Court of Appeals used the Delaware approach to determine whether BAT was a *734 controlling stockholder and concluded that plaintiff alleged enough facts to support a reasonable inference that BAT was a controlling stockholder. **611 Id. at ----, ----, 796 S.E.2d at 332, 337. The Court of Appeals also concluded that plaintiff had standing to bring a direct claim against BAT because plaintiff sufficiently pleaded that BAT owed plaintiff a special duty. Id. at ----, 796 S.E.2d at 338 (citing Barger v. McCoy Hillard & Parks , 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997) ).
BAT petitioned this Court for discretionary review on various issues related to whether a minority stockholder could owe fiduciary duties to other stockholders under North Carolina law and whether the Court of Appeals correctly found that a controlling stockholder necessarily owes a special duty to other stockholders for standing purposes. This Court allowed BAT's petition.
II. Analysis
BAT moved to dismiss plaintiff's Complaint for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The Business Court assumed without deciding that plaintiff had standing, and then dismissed plaintiff's Complaint for failure to state any claim for breach of fiduciary duty. Nevertheless, we will consider the issue of standing before addressing the Rule 12(b)(6) issue because "standing is a 'necessary prerequisite to a court's proper exercise of subject matter jurisdiction.' " Willowmere Cmty. Ass'n v. City of Charlotte , 370 N.C. 553, 561, 809 S.E.2d 558, 563 (2018) (quoting Crouse v. Mineo , 189 N.C. App. 232, 236, 658 S.E.2d 33, 36 (2008) ).
A. Standing
The Court of Appeals concluded that plaintiff had standing to bring a direct claim against BAT because the Complaint contained enough allegations to support a determination that BAT owed a special duty to plaintiff. Corwin , --- N.C. App. at ----, 796 S.E.2d at 338 (citing Barger , 346 N.C. at 658, 488 S.E.2d at 219 ). BAT argues, however, that plaintiff's claims are derivative and that plaintiff lacks standing because he failed to make a pre-suit demand on Reynolds. Because this appeal stems from a trial court's order granting a motion to dismiss under Rule 12(b)(1), we apply de novo review, accepting the allegations in the complaint as true and viewing them in the light most favorable to the non-moving party. Mangum v. Raleigh Bd. of Adjustment , 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008).
A derivative proceeding is defined as "a civil suit in the right of a domestic corporation." N.C.G.S. § 55-7-40.1 (2017). Before commencing a derivative proceeding, a stockholder must make a written demand **612 "upon the corporation to take suitable action." Id. § 55-7-42 (2017). In line with this requirement, this Court has stated that "[t]he general rule is that '[s]hareholders ... generally may not bring individual actions to recover what they consider their share of the damages suffered by [a] corporation.' " Green v. Freeman , 367 N.C. 136, 142, 749 S.E.2d 262, 268 (2013) (second alteration in original) (quoting Barger , 346 N.C. at 660, 488 S.E.2d at 220-21 ). There are two exceptions to this general rule: shareholders "may bring an individual action ... when (1) 'the wrongdoer owed [them] a special duty' or (2) they suffered a personal injury 'distinct from the injury sustained by ... the corporation itself.' " Id. at 142, 749 S.E.2d at 268 (second and third alterations in original) (quoting Barger , 346 N.C. at 659, 661, 488 S.E.2d at 219, 221 ).
The first exception applies when the wrongdoer owes a duty that is "personal to plaintiffs as shareholders and [is] separate and distinct from the duty defendant[ ] owe[s] the corporation," such as a fiduciary duty owed to the stockholders. Barger , 346 N.C. at 659, 488 S.E.2d at 220. In this case, whether plaintiff had standing to bring a direct claim under the first exception depends on whether BAT was a controlling stockholder that owed plaintiff fiduciary duties. This issue is the same issue that we must decide in order to determine whether the Business Court properly dismissed plaintiff's Complaint under Rule 12(b)(6) for failure to state a claim. We will therefore determine whether plaintiff has standing under the second exception before addressing *735 whether BAT owed plaintiff fiduciary duties, to ascertain whether it gives us an independent basis for asserting jurisdiction.
The second Barger exception applies when a plaintiff suffers an injury that is "distinct from the injury suffered by the corporation itself." Green , 367 N.C. at 144, 749 S.E.2d at 269 (quoting Barger , 346 N.C. at 661, 488 S.E.2d at 221 ). In this case, plaintiff asserts that he and the Reynolds stockholders other than BAT have been injured by the reduction of their percentage ownership of Reynolds. Before the transaction, BAT owned 42% of the outstanding shares, and plaintiff and other stockholders owned the remaining 58% of shares. Under the transaction agreement, however, former Lorillard stockholders would own approximately 15% of Reynolds shares, and BAT would be permitted to purchase additional shares to maintain its 42% ownership. That means that plaintiff and the other stockholders would only own 43% of Reynolds shares after the transaction. Plaintiff claims that this arrangement allowed BAT to "maintain[ ] its own ownership stake and control over [Reynolds] while diluting the stake of Plaintiff and the Class by means of the BAT Share Purchase." This dilution translates to a reduction in voting power **613 for plaintiff and the other non-BAT stockholders, and that alleged injury affects the voting power of plaintiff and the non-BAT stockholders rather than the corporation itself. We therefore conclude that plaintiff had standing to bring a direct claim against BAT under the second Barger exception due to the alleged dilution of plaintiff's voting power.
While this Court has never before addressed whether a stockholder can bring a direct claim for voting power dilution, caselaw from Delaware permits it, and we find that caselaw to be persuasive. In Tooley v. Donaldson, Lufkin & Jenrette, Inc. , the Supreme Court of Delaware held that whether an action is direct or derivative is determined by "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)[.]" 845 A.2d 1031, 1033 (Del. 2004) (en banc). Before Tooley , Delaware applied a "special injury" test, which Tooley rejected. Id. at 1038-39. At first glance, it might appear that Delaware precedent should therefore be irrelevant to our analysis, on the assumption that the special injury test that Tooley rejected is similar to our Court's current "distinct injury" exception under Barger. The special injury test in Delaware, however, was different than the distinct injury exception in North Carolina. The phrase "special injury" referred to a "wrong ... inflicted upon the stockholder alone" and not shared by the other stockholders , see id. at 1037, whereas "distinct injury" in North Carolina means that the injury to the stockholder is distinct from the injury suffered by the corporation , Green , 367 N.C. at 144, 749 S.E.2d at 269. So the Tooley analysis, like the second Barger exception, focuses on whether the stockholder suffered a harm that is distinct from the harm suffered by the corporation . Focusing on the stockholder's harm compared to the corporation's harm rather than on the harm of one stockholder compared to the harm of other stockholders makes sense because, as Tooley explained, "a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim." 845 A.2d at 1037.
The Supreme Court of Delaware has recognized in In re Tri-Star Pictures, Inc., Litigation , furthermore, that voting power dilution is a harm to stockholders when the minority stockholders' voting power is decreased while the majority stockholder's power is increased. 634 A.2d 319, 330 (Del. 1993). In Tri-Star , the Supreme Court of Delaware noted that the plaintiffs, who were minority stockholders, "suffer[ed] harm by voting power dilution which, in essence, is no more than a relative diminution in the minority's proportionate influence over corporate **614 affairs." Id. The court further explained that "[v]oting power dilution is a harm distinct and separate from" other harms suffered by the minority stockholders, such as alleged nondisclosure in proxy materials, because "[t]he harm from voting power dilution goes to the impact of an individual *736 stockholder's vote." Id. at 330 n.12. Although Tri-Star was decided before Tooley , Delaware courts, including the Supreme Court of Delaware, have continued to cite the pertinent analysis from Tri-Star while applying the Tooley test for distinguishing between direct and derivative claims. See, e.g. , Gentile v. Rossette , 906 A.2d 91, 101-03 (Del. 2006) (noting that Tri-Star provides the "analytical framework" for claims based on dilution of stockholder voting power and then applying Tooley to determine that the claim at issue was direct rather than derivative because the harm to minority stockholders was unique from any injury suffered by the corporation and because the only available relief would exclusively benefit those minority stockholders).
Using the Tooley test, the Delaware Court of Chancery has determined that a claim of voting power dilution can be a direct claim "where a significant stockholder's interest is increased at the sole expense of the minority." In re J.P. Morgan Chase & Co. S'holder Litig. , 906 A.2d 808, 818 (Del. Ch. 2005) (quoting In re Paxson Commc'n Corp. S'holders Litig. , No. Civ.A. 17568, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001) ).[5] The Court of Chancery has explained that "[v]oting power dilution may constitute a direct claim, because it can directly harm the shareholders without affecting the corporation, and any remedy for the harm suffered under those circumstances would benefit the shareholders." Oliver v. Boston Univ. , No. Civ.A. 16570-NC, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006) (unreported).[6]
In this case, BAT's voting power did not increase, but it was allowed to remain constant at the sole expense of plaintiff and the other non-BAT
**615 stockholders, whose voting power significantly decreased. This voting power dilution did not harm the corporation itself, but it did harm the non-BAT stockholders. Thus, although this case is the first time that this Court has considered whether voting power dilution is a direct claim, we agree with the relevant reasoning of the Delaware courts that we have discussed, and hold that plaintiff has pleaded "a personal injury." See Green , 367 N.C. at 142, 749 S.E.2d at 268. We further hold that the alleged personal injury, in conjunction with plaintiff's legal claim that BAT breached a purported fiduciary duty to himself and his fellow non-BAT minority stockholders, is enough to confer subject-matter jurisdiction on this Court. Because we have concluded that plaintiff had standing to bring a direct claim for voting power dilution, we will now address whether the Business Court properly granted BAT's motion to dismiss under Rule 12(b)(6).
B. Fiduciary Duties
On appeal from the dismissal of a complaint pursuant to North Carolina Rule of Civil Procedure 12(b)(6), we conduct de novo review to determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." CommScope Credit Union v. Butler & Burke, LLP , 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016) (quoting Bridges v. Parrish , 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013) ). It is well established that dismissal pursuant to Rule 12(b)(6) is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint *737 discloses some fact that necessarily defeats the plaintiff's claim." Wood v. Guilford County , 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citing Oates v. JAG, Inc. , 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985) ).[7] **616 This Court held in Gaines v. Long Manufacturing Company that the majority stockholder of a corporation owes fiduciary duties to the minority stockholders. 234 N.C. 340, 344, 67 S.E.2d 350, 353 (1951). This Court reasoned that majority stockholders owe fiduciary duties to minority stockholders because majority stockholders "have a community of interest with the minority holders in the same property and because the latter can act and contract in relation to the corporate property only through the former." Id. at 344, 67 S.E.2d at 353 (quoting 13 Am. Jur. Corporations § 423 (1938) ). "It is the fact of control of the common property held and exercised ... that creates the fiduciary obligation on the part of the majority stockholders in a corporation for the minority holders." Id. at 344-45, 67 S.E.2d at 353 (quoting 13 Am. Jur. Corporations § 423 ). Under Gaines , BAT did not necessarily owe fiduciary duties to the other stockholders because BAT was not a majority stockholder.
This Court has never held that a minority stockholder owes fiduciary duties to other stockholders, but it has also never held that a minority stockholder cannot owe fiduciary duties to other stockholders. We do not need to decide that question today, however. Even if we agreed with Delaware courts that a minority stockholder may owe fiduciary duties to other stockholders based on its exercising actual control over the board of directors, the complaint in this case would still fail to state a claim upon which relief can be granted because the Complaint does not adequately allege that BAT exercised actual control over the Reynolds board here.
In Delaware, "[i]t is well settled law that only a 'controlling stockholder' owes fiduciary duties to other stockholders." In re Primedia Inc. Derivative Litig. , 910 A.2d 248, 257 (Del. Ch. 2006) (citing Kahn v. Lynch Commc'n Sys., Inc. , 638 A.2d 1110, 1113-14 (Del. 1994) ). A stockholder is considered controlling if it owns more than 50% of the corporation's voting power or if it "exercises control over the business and affairs of the corporation." Id. (quoting Kahn , 638 A.2d at 1113 (emphasis omitted) ). Put another way, a minority stockholder is considered a controlling stockholder if the minority stockholder exercises "domination ... through actual control of corporate conduct." In re Morton's Rest. Grp., Inc. S'holders Litig. , 74 A.3d 656, 664 (Del. Ch. 2013) (quoting Citron v. Fairchild Camera & Instrument Corp. , 569 A.2d 53, 70 (Del. 1989) ). This inquiry focuses on actual control over the board of directors . Id . at 664-65 ; In re KKR Fin. Holdings LLC S'holder Litig. , 101 A.3d 980, 993-94 (Del. Ch. 2014), aff'd sub nom. Corwin v. KKR Fin. Holdings LLC , 125 A.3d 304 (Del. 2015). Actual control exists only when the allegedly controlling stockholder "exercises such **617 formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." In re KKR , 101 A.3d at 993 (alterations in original) (quoting In re Morton's , 74 A.3d at 665 ) (internal quotations omitted). As a necessary prerequisite for a minority stockholder to exercise actual control, then, the stockholder's "power must be so potent that independent directors ... cannot freely exercise their judgment, fearing retribution." Id. (emphasis omitted) (quoting In re Morton's , 74 A.3d at 665 (alteration in original) ) (internal quotations omitted). *738 To survive a motion to dismiss in Delaware, a claim for breach of fiduciary duty by a minority stockholder must contain more than "[t]he bare conclusory allegation that a minority stockholder possessed control.... Rather, the [c]omplaint must contain well-pled facts showing that the minority stockholder 'exercised actual domination and control over ... [the] directors.' " In re Morton's , 74 A.3d at 664-65 (emphasis added) (fourth and fifth alterations in original) (quoting In re Sea-Land Corp. S'holders Litig. , No. Civ.A. 8453, 1988 WL 49126, at *3 (Del. Ch. May 13, 1988) (unreported) ). Even at the motion to dismiss stage, Delaware courts have noted that "[t]his actual control test is 'not an easy one to satisfy' as 'stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.' " Sciabacucchi v. Liberty Broadband Corp. , No. CV 11418-VCG, 2017 WL 2352152, at *16 (Del. Ch. May 31, 2017) (unreported) (quoting In re PNB Holding Co. S'holders Litig. , No. Civ.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (unreported) ).
That the actual control standard emphasizes the exercise of actual control over the board-an affirmative act by the minority stockholder-and not just the mere possession of power means that an allegation that a minority stockholder has some leverage over the board of directors is not enough. See In re Sea-Land , 1988 WL 49126, at *3 (stating that allegations that amount to significant "leverage" will not allow a complaint to survive because " 'leverage' is not actual domination and control"). A party may, after all, use its leverage to negotiate favorable terms in a transaction with another party even when it has no control (and thus has exercised no control) over that other party. Applying this standard in the context of a Rule 12(b)(6) motion, plaintiff's Complaint necessarily fails if it "reveals the absence of facts" that BAT engaged in some affirmative act to direct or compel the Reynolds board to enter into the Lorillard transaction on the terms that plaintiff takes issue with here. Wood , 355 N.C. at 166, 558 S.E.2d at 494 (citing Oates , 314 N.C. at 278, 333 S.E.2d at 224 ). In other words, the complaint must allege, through well-pleaded facts, actual control , see **618 Sciabacucchi , 2017 WL 2352152, at *16, which refers to control that prevents a company's directors from "freely exercis[ing] their judgment in determining whether or not to approve and recommend" a transaction, In re KKR , 101 A.3d at 993.
In the same vein, the fact that a stockholder possesses contractual rights permitting it to restrict corporate action and thereby giving it leverage over board decisions does not necessarily mean that the stockholder is exercising actual control. Thermopylae Capital Partners, L.P. v. Simbol, Inc. , C.A. No. 10619-VCG, 2016 WL 368170, at *13 (Del. Ch. Jan. 29, 2016) (unreported). Unexercised contractual rights alone, such as board veto power, do not equate to actual control over a board. Williamson v. Cox Commc'ns, Inc. , No. Civ.A. 1663-N, 2006 WL 1586375, at *5 (Del. Ch. June 5, 2006) (unreported). Even a stockholder who exercises its contractual rights to further its own goals "is simply exercising [its] own property rights, not that of others, and is no fiduciary." Thermopylae , 2016 WL 368170, at *14. For example, in Superior Vision Services, Inc. v. ReliaStar Life Insurance Co. , No. Civ.A. 1668-N, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) (unreported), the allegedly controlling stockholder had a contractual right to withhold its consent and effectively veto any dividend payment that the board voted to approve, id. at *4. The stockholder exercised that right, but the Delaware Court of Chancery concluded that the stockholder was not controlling solely by virtue of "exercis[ing] a duly-obtained contractual right." Id. at *5. The court reasoned that to hold otherwise would mean that "any strong contractual right, duly obtained by a significant shareholder (a somewhat elusive term in itself), would be limited by and subject to fiduciary duty concerns." Id.
A minority stockholder who exercises contractual rights may, however, be considered a controlling stockholder if the stockholder "achieved control or influence over a majority of directors through non-contractual means." Thermopylae , 2016 WL 368170, at *14. Additionally, it could be possible to determine that a stockholder is a controlling one "where the holding of contractual rights [is] coupled with a significant equity position and other factors, ... especially if those contractual *739 rights are used to induce or to coerce the board of directors to approve (or refrain from approving) certain actions." Superior Vision , 2006 WL 2521426, at *5. In Williamson v. Cox Communications, Inc. , for example, the court found that unexercised veto power was significant in denying a motion to dismiss because the stockholder had veto power over all board decisions and could use that veto power "to shut down the effective operation of the ... board of directors." 2006 WL 1586375, at *5. The veto power therefore gave that stockholder coercive leverage **619 because the board effectively had to get the stockholder's approval in order to take any action whatsoever. Id. But "a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose." Superior Vision , 2006 WL 2521426, at *5.
On the other hand, the existence of contractual restrictions on a stockholder's ability to exercise control may prevent a finding of control at the pleading stage. See Sciabacucchi , 2017 WL 2352152, at *17-18. In Sciabacucchi v. Liberty Broadband Corp. , for instance, contractual restrictions prevented the allegedly controlling stockholder from designating a majority of the board, soliciting proxies, or obtaining more than 35% of the voting stock. Id. at *18. The restrictions also required certain directors and unaffiliated stockholders to approve specific transactions like the one at issue. Id. The court concluded that these "contractual handcuffs," among other things, prevented a finding that the plaintiff had adequately pleaded actual control. Id. at *20.
Threats and demands, however, may support a claim that the stockholder exercised actual control. See Kahn , 638 A.2d at 1114. In Kahn v. Lynch Communication Systems, Inc. , the Supreme Court of Delaware affirmed the Court of Chancery's determination that a minority stockholder was controlling when the 43.3% stockholder threatened the board, saying, "[Y]ou must listen to us. We are 43 percent owner. You have to do what we tell you." Id. There was also evidence in Kahn that board members were intimidated by this stockholder and therefore complied with its demands instead of exercising their own independent business judgment. Id. at 1114-15. Thus, Kahn suggests that allegations of a threat by a significant minority stockholder, plus allegations that the board was intimidated by that threat, may be enough to establish actual control.
As we have already said, we do not need to decide whether to adopt the Delaware approach to determining controlling-stockholder status in order to decide this case. Even under the Delaware approach, we conclude that plaintiff has failed to allege facts that, if true, would establish that BAT exercised actual control over the Reynolds board of directors, and therefore that plaintiff has failed to plead a breach-of-fiduciary-duty claim.
Plaintiff claims that the Governance Agreement gave BAT the ability to control the Reynolds board. In fact, the exact opposite is true. In several ways, the Governance Agreement placed "contractual handcuffs" on BAT that prevented it from controlling the Reynolds board. See Sciabacucchi , 2017 WL 2352152, at *20. BAT could nominate only five of **620 the thirteen Reynolds directors, and three of those directors could not currently be (or have been in the past three years) an officer, director, or employee of BAT. Generally, BAT was required to vote all of its shares in favor of electing the directors that it did not nominate, and, if their removal was sought, BAT was required to vote all of its shares against their removal. And BAT could not seek to remove any of the directors that it did not nominate. BAT therefore had no means of retribution against the majority of the directors that could have impaired the ability of those directors to exercise independent judgment. See In re KKR , 101 A.3d at 993-94. BAT also could not increase its ownership percentage during the standstill period, which was in effect when this transaction occurred. And the Other Directors who were not nominated by BAT or recently affiliated with BAT had to approve this transaction in a separate vote-which they did unanimously.
Plaintiff argues that BAT's contractual approval rights over the issuance of shares and *740 the sale of intellectual property in this transaction gave BAT actual control, but contractual approval rights do not equate to actual control. Superior Vision , 2006 WL 2521426, at *4-5. Although BAT could stop this transaction from happening, BAT could not make it happen. To be a controlling stockholder, the minority stockholder must have "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." In re PNB , 2006 WL 2403999, at *9. Merely being able to stop a transaction does not give a minority stockholder the same level of power that a majority stockholder would have, because a majority stockholder would have the power both to stop a transaction and to make it happen . See Gaines , 234 N.C. at 344, 67 S.E.2d at 353 (noting that a majority stockholder has "the power, by the election of directors and by the vote of [its] stock, to do everything that the corporation can do" (quoting 13 Am. Jur. Corporations § 422 ) ). Although a minority stockholder with veto power might be able to exercise that same level of power through coercion, see Williamson , 2006 WL 1586375, at *5, merely having veto power over the Board's ability to enter into this particular transaction is not enough. To be clear, plaintiff does not allege that Reynolds had to enter into this transaction-much less to enter into this transaction as it was structured, which is what triggered BAT's contractual right to veto it. So the fact of BAT's contractual rights did not, on its own, give BAT the kind of coercive power over the Reynolds board that could allow BAT to exercise actual control. Cf. Kahn , 638 A.2d at 1112-13 (noting that the Lynch board had determined that Lynch needed to obtain certain technology to remain competitive and that Lynch's "alternatives to [the] cash-out merger" that its significant stockholder Alcatel had proposed "had been investigated but were impracticable"). **621 As we have already said, of course, a stockholder who holds contractual rights could be considered a controlling stockholder "where the holding of contractual rights [is] coupled with a significant equity position and other factors." Superior Vision , 2006 WL 2521426, at *5. But as we discuss more fully below, plaintiff has failed to plead sufficient "other factors" to support such a finding in this case.
Plaintiff claims that BAT's involvement in the negotiations demonstrates actual control. Plaintiff does not allege that BAT ever threatened the Reynolds board in any way, however-unlike, for example, the stockholder who was considered controlling in Kahn , 638 A.2d at 1114-15 -even though BAT was involved in many of the discussions regarding the Lorillard transaction from an early date. Admittedly, BAT did represent that it would support the transaction only on terms that were agreeable to BAT. BAT wanted to maintain its 42% ownership interest after the transaction and did not want the transaction to affect the terms of the Governance Agreement, but in expressing that, BAT was making a statement only about exercising its veto power. And a statement that does not express the intent to do anything other than exercise veto power does not make BAT a controlling stockholder, because, in making that statement, BAT was merely informing the board of how it would exercise its contractual rights-rights that were the property of BAT alone and that could not turn BAT into a fiduciary. See Thermopylae , 2016 WL 368170, at *14.
Plaintiff also alleges that BAT had additional leverage in the transaction due to the threat that BAT would buy the remaining 58% of Reynolds' shares at the expiration of the standstill. But the Complaint does not actually allege that BAT ever threatened to do that. It merely refers to news outlet reports that speculated that BAT would buy the remaining shares at that time: specifically, to a report from the Telegraph stating "that Citigroup analysts had 'talked up the likelihood' that BAT would buy the remaining 58% of Reynolds" and to a report from the Daily Mail that there was "growing speculation [that BAT] is ready to splash out billions of pounds buying the 58 per cent of US rival Reynolds American it does not already own." And the Complaint alleges that the CEO of BAT told stockholders at its 2014 annual stockholder meeting "that BAT looks at acquiring Reynolds on a yearly basis." Accepting these allegations in the complaint *741 as true merely requires us to accept that the Telegraph and the Daily Mail reported on this "speculation" and that BAT's CEO told stockholders that BAT considered acquiring Reynolds every year. None of these allegations, if taken as true, indicate that BAT was actually planning to acquire Reynolds, or, more importantly, that **622 BAT had actually threatened Reynolds with the idea of purchasing the remaining shares at the expiration of the standstill if BAT's preferences were not accommodated. And, more generally, taking as true plaintiff's allegation that "[t]he threat of a complete takeover gave BAT additional leverage to impose its terms on the Reynolds Board during [ ] negotiations," we must note again that the mere existence of leverage does not equate to the exercise of actual control. See In re Sea-Land , 1988 WL 49126, at *3. Where, as here, the "threat" to which a complaint refers is the mere ability to take over a company, that ability does not amount to actual control because it does not involve a stockholder who prevents board members from exercising their own independent judgment.
Plaintiff suggests in the complaint that the board was not independent of BAT in this transaction for other reasons. Plaintiff claims that the Other Directors-who were not nominated by BAT or recently affiliated with BAT-did not engage independent legal counsel soon enough and should have also engaged independent financial advisors. Plaintiff alleges that there is no evidence that Reynolds explored other financing options until just weeks before the transaction was executed. Plaintiff also suggests that many of Reynolds' directors had conflicts of interest in the transaction because seven of the directors were either current or former officers, directors, or attorneys for BAT or its affiliates. And, at times, BAT-appointed Reynolds directors even spoke on behalf of BAT during meetings about the proposed transactions, according to plaintiff's allegations.
But, aside from the fact that any BAT nominees representing BAT's interests to the board were necessarily in the minority, the presence of board members who merely share interests with a significant stockholder does not give that stockholder actual control of the board; the proper focus is on whether the allegedly controlling stockholder exercised power over the board rather than on whether the directors had conflicts of interest. See Sciabacucchi , 2017 WL 2352152, at *17. To the extent that plaintiff relies on any of the above actions by the directors to state that BAT exercised actual control over the board, moreover, plaintiff's allegations are insufficient because plaintiff does not allege any act by BAT to direct, compel, or coerce the actions of the directors. As to the claim at issue here, after all, plaintiff is claiming a breach of fiduciary duty by BAT , not by any of the Reynolds directors (whether they be directors designed by or otherwise connected to BAT or not).
The dissent's reliance on plaintiff's allegations that the board failed to obtain outside and independent advice and counsel is marked by the same erroneous reasoning. Even if the Reynolds board should have **623 engaged, but failed to engage, independent counsel, or otherwise failed to comply with its own legal obligations (which we take no position on), that would in no way show that BAT "prevent[ed] the ... board from freely exercising its independent judgment in considering the [transaction]." In re KKR , 101 A.3d at 995. Plaintiff cannot simply allege that the Reynolds board failed to comply with all of its legal duties (assuming, for the sake of argument, that he has at least done that); he must allege facts that would show that BAT prevented the board from acting independently . He has failed to do so.
Plaintiff points to recommendations of the Other Directors that were ultimately rejected as further evidence that BAT had actual control over the board. During negotiations, the Other Directors discussed reducing BAT's ownership percentage after the merger to allow a greater ownership level for Lorillard's stockholders, but this change ultimately never happened. Plaintiff does not allege any facts showing that the ultimate rejection of this change was due to BAT's intervention, though; the mere fact that this change was considered and rejected does not mean that BAT had actual control of the board. And even if BAT had influenced the *742 decision on this particular aspect of the transaction, that does not mean that BAT exerted actual control over the board with respect to the transaction as a whole. Once again, its influence on the decision would be readily explained by BAT's leverage over the transaction, as a major financer of the transaction and as a holder of contractual rights implicated by the transaction. Because that leverage did not equate to actual control over the Reynolds board with respect to the transaction, anything that arose from that leverage does not equate to actual control, either.
Similarly, the Other Directors sought to remove a provision in the proposed merger agreement that required BAT to vote its shares of Reynolds stock in favor of the transaction regardless of whether the Reynolds board changed its recommendation on the transaction. Lorillard, however, insisted that the provision remain in the agreement. Far from controlling this decision, BAT said that it would not commit to the provision over the objections of the Other Directors. The Other Directors ultimately agreed to allow the provision to remain in the proposed merger agreement, though, and remain it did. This change, then, was not rejected because of BAT's control over the Reynolds board. Instead, it was rejected because of Lorillard's demands and the Other Directors' acquiescence to those demands. Anyway, it is unclear why plaintiff thinks that the retention of this provision is helpful to his cause. All that the provision did was to restrict BAT's ability to freely decide whether to vote in favor of the transaction.
**624 To the extent that plaintiff argues that terms in the agreement that are favorable to BAT demonstrate control, those arguments also fail. It is reasonable to infer, based on the pleadings, that Reynolds wanted BAT's support for the transaction and that BAT had some leverage because of the number of shares that it owned and its willingness to help finance the transaction (and because BAT could veto a transaction that, like the one proposed, was structured in a way that stock representing over 5% of Reynolds' stockholders' voting power had to be issued). Leverage is not the same as actual control, though, and does not, on its own, transform a minority stockholder into a controlling stockholder. See In re Sea-Land , 1988 WL 49126, at *3.
At best, the allegations that some terms in the transaction agreement were favorable to BAT show only that BAT's contractual rights gave it the ability to secure some favorable terms from the board. Those allegations do not show that BAT exercised control over the board-that is, to make it take action. If they did, then every contractual right that allowed a stockholder to exert some leverage over a transaction would automatically convert the stockholder into a controlling stockholder. That, in turn, would contravene the principle that a "contractual right ..., without more," does not turn "a significant shareholder" into "a 'controlling shareholder.' " Superior Vision , 2006 WL 2521426, at *5.
The terms of the agreement allowed BAT to maintain its 42% ownership interest in Reynolds by purchasing shares at a rate lower than the closing price for Reynolds shares the day before the transaction agreements were signed. That purchase price was based on the closing price of Reynolds stock on 2 July 2014, which was the date used to set the financial terms of the acquisition. Setting the purchase price ahead of time makes sense because Reynolds would have needed to know how much money it would receive from BAT in order to secure the rest of the financing required to complete the transaction. Further, using this date allowed the purchase price to be set before news of the proposed transaction was publicly released and affected stock prices. This term of the agreement therefore does not indicate actual control.
Reynolds and BAT also agreed to pursue a technology-sharing initiative for next generation tobacco products such as digital vapor cigarettes. Plaintiff alleged that "the Director Defendants ... agreed to allow BAT to access Reynolds'[ ] game-changing technology without adequate compensation," thereby removing any "need for BAT to pay the Public Shareholders a control premium to buy the rest of the Company." But it is unclear how this agreement demonstrates that BAT had actual control of the Reynolds board with *743 respect to the transaction to purchase **625 Lorillard. The dissent points to the perceived threat of a takeover by BAT and to the allegation that this technology-sharing agreement made Reynolds a "significantly less attractive takeover target for BAT" and contends that these allegations, taken as true, show that BAT exercised actual control over the board. Again, though, leverage to obtain favorable terms in an agreement does not necessarily indicate that the beneficiary of those favorable terms was a controlling stockholder.
Overall, plaintiff's allegations and the incorporated Governance Agreement demonstrate that BAT did not have majority voting power either on the board or as a stockholder, that BAT could not retaliate against the non-BAT appointed directors who made up a majority of the board, and that the Lorillard transaction could not be approved without the separate approval of the Other Directors, who were Independent Directors not nominated by BAT. Because of these facts, BAT could not and did not exercise actual control over the Reynolds board. Additionally, plaintiff has filled his Complaint with allegations of BAT's leverage and bargaining power-contractual or otherwise-and has also demonstrated that BAT was able to obtain favorable terms for itself during Reynolds' acquisition of Lorillard. But again, BAT's having bargaining power and negotiating a good deal because of it does not mean that BAT engaged in any coercive behavior or otherwise exercised actual control over the board.
Considering the restrictions in the Governance Agreement that we discuss above, and considering the absence of allegations of coercive or otherwise controlling actions on the part of BAT, plaintiff has failed to allege that BAT exercised such domination and control over the Reynolds board that BAT was indistinguishable from a majority stockholder. See In re KKR , 101 A.3d at 993-94. Under the Delaware controlling-stockholder standard, therefore, plaintiff's Complaint "on its face reveals the absence of facts sufficient to make a good claim" that BAT owed plaintiff fiduciary duties because it controlled the Reynold's board, and it also "discloses some fact[s] that necessarily defeat[ ] the plaintiff's claim" that BAT could even exercise such control. Wood , 355 N.C. at 166, 558 S.E.2d at 494 (citing Oates , 314 N.C. at 278, 333 S.E.2d at 224 ).
III. Conclusion
For the reasons stated above, the Court of Appeals erred in concluding that plaintiff's allegations, if true, would satisfy the actual control test as that test is elucidated in Delaware caselaw. Because BAT was not a majority or controlling stockholder, it did not owe fiduciary duties to **626 the other Reynolds stockholders, and the Business Court properly dismissed plaintiff's breach-of-fiduciary-duty claim against BAT. We accordingly reverse the decision of the Court of Appeals on this issue. Plaintiff has not appealed the dismissal of his claims against defendant directors or Reynolds to this Court. The dismissal of those claims is therefore not before us, and the decision of the Court of Appeals as to those claims remains undisturbed.
REVERSED.

Most of the provisions of the Governance Agreement that we discuss here refer not to BAT but to its subsidiary, B&W. However, the Governance Agreement specifically provides that "B&W may assign, in its sole discretion, any of or all its rights, interests and obligations under this Agreement to BAT or any of its Subsidiaries that agrees in writing to be bound by the provisions hereof." We can find no portion of the record indicating that B&W made such an assignment to BAT, but, because the courts below and both parties to this appeal treat BAT as having assumed B&W's rights and obligations under the Governance Agreement, we also do so for the purpose of our decision here.

This portion of the definition of the term "Independent Director" applies only if Reynolds is listed on the New York Stock Exchange. Because the Complaint alleges that Reynolds "trades on the New York Stock Exchange," though, that portion of the definition applies to the term for the purposes of this motion.

The standstill period was set to run from 30 July 2004-the effective date of the Governance Agreement-until either the tenth anniversary of the Governance Agreement or the date on which a significant transaction occurred, whichever was earlier. According to the Governance Agreement, a significant transaction would be "any sale, merger, acquisition ..., consolidation, dissolution, recapitalization or other business combination involving Reynolds American or any of its Subsidiaries pursuant to which more than 30% of the Voting Power or the consolidated total assets of Reynolds American would be acquired or received" by an outside party.

However, the Complaint indicates that plaintiff lacks specific information about whether a separate vote by the Reynolds board on the technology-sharing agreement occurred (or, by necessary implication, how the board voted if a vote did occur).

The Supreme Court of Delaware has likewise clarified that, although Tri-Star itself speaks of, and the facts in Tri-Star involved, a majority stockholder's power being increased, the Tri-Star rule applies when a "significant or controlling stockholder['s]" interest is increased. See In re J.P. Morgan Chase & Co. S'holder Litig. , 906 A.2d 766, 774-75 (Del. 2006) (en banc) (emphasis added) (quoting In re Paxson , 2001 WL 812028, at *5 ).

Delaware allows unpublished cases to be cited as precedent. Stephen R. Barnett, No-Citation Rules Under Siege: A Battlefield Report and Analysis , 5 J. App. Prac. & Process 473, 481 (2003). Specifically, the Rules of the Court of Chancery of the State of Delaware refer to both reported and unreported Delaware cases as "principal Delaware decisions" that can be included in a party's compendium of authorities for the court to review along with its brief. Del. Ch. Ct. R. 171(i). In ascertaining the nature of Delaware law, therefore, we cite both reported and unreported Delaware Court of Chancery cases throughout this opinion and consider them to have equal authority for the purposes of our analysis.

The dissent relies heavily on the Rule 12(b)(6) standard recited in cases such as Turner v. Hammocks Beach Corp. , 363 N.C. 555, 559, 681 S.E.2d 770, 774 (2009), and State ex rel. Cooper v. Ridgeway Brands Mfg., LLC , 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008), which, in turn, finds its genesis in Conley v. Gibson , 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), abrogated by Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). We decline to address what admittedly may be a lack of doctrinal consistency in our standard of review for Rule 12(b)(6) motions when that question was not among "the issues stated in ... the petition for discretionary review and the response thereto filed." N.C. R. App. P. 16(a). In any event, this Court routinely uses the Rule 12(b)(6) standard that we apply here in assessing the sufficiency of complaints in the context of complex commercial litigation. See, e.g. , Krawiec v. Manly , 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018) ; Christenbury Eye Ctr., P.A. v. Medflow, Inc. , 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017).